[No. B169206. Second Dist., Div. Four. July 22, 2004.]

In re the Marriage of BRIAN F. and VICTORIA DAVIS.
BRIAN F. DAVIS, Respondent, v.
VICTORIA DAVIS, Appellant.

## COUNSEL

Nancy Bennett Bunn for Appellant.

Brian F. Davis, in pro. per., for Respondent.

**O**PINION

**CURRY, J.—**

## INTRODUCTION

This matter arises after a judgment of marital dissolution was entered as to the marriage of Brian and Victoria Davis. Victoria appeals from a domestic relations order entered after Brian brought an order to show cause with regard to the effect of a postdissolution enhancement of his retirement benefits on his obligation to pay spousal support. Based on the nature of the retirement benefits at issue and the language of the judgment of dissolution, which incorporated the terms of the parties' marital settlement agreement, the trial court ruled that Brian's spousal support obligation effectively terminated at the time he began participating in the enhanced retirement program. As we will explain, based on our independent interpretation of the relevant case law and the language of the judgment of dissolution, we reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Judgment of Marital Dissolution*

The parties were married on September 4, 1966. Brian filed a petition for marital dissolution on January 9, 2001. Victoria filed a response on January 18, 2001. On March 8, 2001, the parties filed a stipulation agreeing that Brian would pay Victoria $1,480 per month as spousal support, pending further order of the court. Brian's employer was the Los Angeles City Police Department; accordingly, the Los Angeles City Fire and Police Pension Plan was joined as an Employee Benefit Plan claimant to the action for marital dissolution on December 28, 2001.

The parties reached a marital settlement agreement, which was incorporated into the judgment of marital dissolution entered February 6, 2002. Therein, the parties agreed their date of marital separation was February 14, 2000.

Brian began employment with the Los Angeles Police Department (LAPD) on April 21, 1969. Victoria has been employed by Albertson's since November 1986. As part of their marital settlement agreement, they agreed that each would keep as their separate property all of their respective earnings after the date of separation. They agreed that Victoria could keep as her separate property the pension benefits she had earned during the marriage.

Victoria wished to keep the community property residence in Newport Beach; the home contains a rental unit, which would provide supplemental

income. This supplemental income was taken into account in determining the spousal support order and property division. To equalize the property division, the parties agreed that Victoria would be awarded a reduced share of Brian's pension, 25 percent rather than 50 percent. In paragraph 1(A), spousal support was set at $1,480 per month "commencing September 1, 2001, and continuing thereafter until the death of either party, the remarriage of [Victoria], or the date [Victoria] receives the first payment that reflects her 25% interest in [Brian's] pension, and the gross amount of that payment exceeds $1,480.00 per month, whichever shall first occur, at which time spousal support shall terminate forever." In paragraph 1(C), the judgment further provided: "Neither the amount nor the duration of spousal support is modifiable under any circumstances, and/or for any reason, and the Court is without jurisdiction to modify the amount or duration of spousal support. In the event [Brian] pays spousal support to [Victoria] for a month in which [Victoria] receives her 25% interest in [Brian's] pension and the gross amount she receives exceeds $1,480.00, [Victoria] shall immediately reimburse the spousal support she received for that month to [Brian]." As to Brian's pension plan, the judgment provided in paragraph 4(A): "[Brian's] pension plan, Los Angeles City Fire And Police Pension System Plan (L.A. City Safety XVIII Plan), shall be divided by a Qualified Domestic Relations Order prepared by attorney Nancy Bunn or other qualified preparer agreed to by both parties. The Plan, which is fully vested, shall be divided 75% to [Brian] and 25% to [Victoria], to equalize the division of community assets."[1]

### 2. *Subsequent Changes in Brian's Retirement Benefits*

Shortly after the parties executed the stipulated agreement at the end of 2001, Brian's retirement options changed. At that time, Brian had been with the LAPD for over 30 years and had reached the maximum retirement available under his then-current retirement tier, tier 2 (i.e., 70 percent of his final salary). On January 1, 2002, the City of Los Angeles Department of Fire and Police Pensions Board (the Pension Board) offered eligible members the option of transferring from their current tier to tier 5, under which contributions to the pension plan could continue until a member reached 33 years of services, rather than ceasing at 30 years. Tier 5 allowed a member to retire at 90 percent of his salary upon reaching 33 years of service. Brian elected this option, with the effect that it would increase both his and Victoria's monthly payments from his pension once he retired. Brian reached "maximum benefit retirement date," or 33 years of service, on April 21, 2002.

On May 1, 2002, the Pension Board made available a second retirement option, the "Deferred Retirement Option Plan" (the DROP), for which Brian was also eligible. The DROP was intended to offer an incentive to officers

---

[1] We note that thereafter, Bunn associated into the action as cocounsel for Victoria.

who were eligible to retire to continue working for the LAPD, as it was having difficulty recruiting new officers and retaining veteran officers. Under the DROP, eligible officers could "retire" and commence drawing their pensions while continuing to work and earning a salary for up to an additional five years. Rather than actually receiving monthly pension payments, however, a DROP account was created which would be credited monthly in the amount of the member's pension payment.

According to materials distributed to members of the pension plan, the "DROP account is set up like a savings account within the Pension Plan. Every month while [the officer is] in DROP, [his] entire monthly service pension amount is deposited into [his] DROP account." Members would retire at the same percentage of their salary whether they chose the conventional retirement option or the DROP option. The pension payment credited monthly to the DROP account would receive annual cost of living increases and earn interest at the rate of 5 percent per year. Members could participate in the DROP for a maximum of five years, but could leave service sooner.[2]

Upon discontinuing participation in the DROP and terminating employment with the LAPD, the member would begin to receive monthly pension payments based upon years of service and salary at the time of entering the DROP, plus cost of living increases received while in the DROP. At that time, members could receive the DROP funds in a lump sum, or could elect to roll the funds over into a tax-deferred account.

Under the DROP, members "are considered 'retired' for purposes of pension calculations only." Participants can no longer qualify a new spouse for survivor benefits, even though they continue to work for the LAPD. No further service credit is earned during the DROP participation period. Participants in the DROP have the same rights, privileges, and benefits as with active employment. "DROP account funds are not eligible for distribution until after actual retirement/termination as a sworn member of the Fire or Police Department."

Brian made the irreversible election to participate in the DROP from its inception date, which was 10 days after he reached his maximum benefit retirement date (33 years of employment) on April 21, 2002. Thus, his ability to retire at 90 percent of his salary was not impeded. He had planned to leave the LAPD as of April 21, 2002, and obtain other employment, in order to augment his retirement income and purchase a home. Instead, he decided to participate in the DROP.

---

[2] Brian notes he elected to stay two additional years, having submitted a statement of intention to exit DROP and terminate employment effective May 1, 2004.

Upon entering the DROP, the monthly pension payment deposited into Brian's DROP account was $6,876.84. Victoria's 25 percent interest was $1,719.21, $239.21 more per month than the spousal support award of $1,480 per month. Brian received two cost of living increases to his pension benefits after electing to participate in the DROP, on July 1, 2002 and July 1, 2003. Brian continued to make monthly spousal support payments, i.e., $1,480 per month, to Victoria throughout the time of his participation in the DROP.

Brian understood that Victoria could not receive directly from the Pension Board her monthly interest in his pension from the date it commenced. Prior to electing to participate in the DROP, Brian contacted Victoria and offered to pay to her monthly her share of his pension benefits from his separate property earnings from the time the pension benefits commenced being credited to his DROP account, in exchange for her agreement that because he would be advancing her share that the entire DROP account would be designated as his separate property. Victoria did not agree to the proposal.

Bunn prepared a qualified domestic relations order (QDRO), but Brian did not agree to its provisions. His attorney sent a letter to Attorney Bunn on April 25, 2002, advising her of his disagreement, noting that the QDRO allowed Victoria to accumulate her share of Brian's monthly pension payments in the DROP account concurrently during the months he paid her spousal support without providing for reimbursement of these pension payments as purportedly required by the stipulated judgment. No agreement could be reached between the parties.

3. *Commencement of the Proceedings Now Before Us*

On September 25, 2002, Brian filed an order to show cause seeking declaratory relief concerning the proper language of the QDRO, and with regard to whether he should pay Victoria her share of his pension and thereby terminate spousal support.

Victoria filed a responsive declaration in opposition on December 27, 2002, requesting that the court file and certify the QDRO previously drafted, and deny Brian's request for relief. She filed a supplemental memorandum of points and authorities on January 7, 2003. Victoria filed a proposed QDRO with the court on February 20, 2003.

Brian filed a reply to the opposition on February 25, 2003, now acting in propria persona.

The matter was heard on March 4, 2003. Victoria asserted that Brian was not retired, and therefore the relief he sought should not be granted. The court

stated that the evidence indicated Brian's status with the LAPD was "retired." Finding further clarification regarding the DROP was necessary, the court continued the hearing to April 30, 2003. Victoria's attorney requested that the city attorney present testimony at that time.

On April 29, 2003, Victoria filed additional documents. On the same date, Brian filed a supplemental declaration in response.

On April 30, 2003, Deputy City Attorney Mary Jo Curwen testified. Thereafter, the trial court found that Brian's service pension is entirely community property and that all funds in his DROP account constitute his service pension entitlement; accordingly, the court awarded 25 percent of Brian's service pension to Victoria. However, it further ordered Brian to "make an interest-free loan to [Victoria] of 1480 deductible dollars a month. And then once she collects the DROP money, then she pays him back $1480 for each month that she got." The court requested that the city attorney prepare a domestic relations order in keeping with the court's ruling.

On June 5, 2003, the court entered the domestic relations order. It provided that "[Brian's] service pension is entirely community property. All funds in [Brian's] DROP account constitute [Brian's] service pension entitlement." Further, "25% of [Brian's] service pension is hereby awarded to [Victoria] as her separate property and that any allowable cost of living adjustments shall be made applicable thereto; that 75% of [Brian's] service pension, including any allowable cost of living adjustments applicable thereto, is awarded to [Brian] as his separate property." Finally, "at such time as DROP account proceeds become payable to [Brian and Victoria], Claimant is hereby ordered to make the following adjustment in the parties' respective interests in these DROP proceeds and to make payment to the parties accordingly: Claimant shall deduct the sum of $1480 per month from [Victoria's] share of the DROP account for each month in which [Victoria's] share of the DROP account exceeds the $1480 per month that [Brian] paid to [Victoria] as spousal support, which sum shall then be credited by the Plan to [Brian's] share of the DROP account; the $1480 deduction shall be a fixed sum (no adjustment on account of cost of living increases or related to interest payable to the DROP account) and shall be pro-rated by the Plan for any partial month of entitlement. This adjustment shall be considered an adjustment in the respective community interests of the parties based upon the provisions set forth in the last sentence of Paragraph 1(C) of the Judgment and shall satisfy [Victoria's] obligation to [Brian] arising therein."

Victoria filed a notice of appeal from that order on August 1, 2003.

## DISCUSSION

### I. Characterization of the DROP Benefit

We begin by discussing whether the DROP account is accurately characterized as community property, or as Brian's separate property. While other California cases have considered the characterization to be given to different forms of enhanced retirement benefits, none have specifically involved a DROP benefit.

We review de novo the issue of the characterization to be given (as separate or community property) to the enhanced retirement benefit at issue here. Because its resolution requires a critical consideration, in a factual context, of legal principles and their underlying values, the determination in question amounts to the resolution of a mixed question of law and fact that is predominantly one of law. (*In re Marriage of Lehman* (1998) 18 Cal.4th 169, 184 [74 Cal.Rptr.2d 825, 955 P.2d 451].) We conclude based on our independent review that the trial court correctly determined that the DROP benefits at issue here were community property.

*In re Marriage of Lehman, supra,* 18 Cal.4th 169 (*Lehman*), involved a "Voluntary Retirement Incentive" (VRI) retirement program, under which an employee of PG&E was given the option of being credited with three putative years of service and enjoying a waiver of the normal actuarial reduction of 18 percent for taking early retirement. The employee retired under the VRI program, and his ex-wife sought an order determining that she owned a community property interest in his retirement benefits *as enhanced.* (*Id.* at pp. 175–176.) The Supreme Court granted review in order to address the issue of characterization of retirement benefits as community or separate property under a defined benefit retirement plan. Specifically: "Does a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits under such a plan own a community property interest in the [latter's] retirement benefits *as enhanced?*" (*Id.* at p. 174, italics added.) The Supreme Court answered the question in the affirmative.

The Supreme Court explained: "The right to retirement benefits 'represent[s] a property interest; to the extent that such [a] right[] derive[s] from employment' during marriage before separation, it 'comprise[s] a community asset . . . .' " (*Lehman, supra,* 18 Cal.4th at p. 177, quoting *In re Marriage of Brown* (1976) 15 Cal.3d 838, 842 [126 Cal.Rptr. 633, 544 P.2d 561].) "The right to retirement benefits is a right to 'draw[] from [a] stream of income

that . . . begins to flow' on retirement, *as that stream is then defined.*" (*Lehman, supra,* at pp. 177–178, italics added, quoting *In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 383 [53 Cal.Rptr.2d 81, 916 P.2d 476], and citing *In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 428 [174 Cal.Rptr. 493, 629 P.2d 1]; and *In re Marriage of Brown, supra,* 15 Cal.3d at p. 848.) "The stream's volume at retirement may depend on various events or conditions after separation and even after dissolution. [Citations.] Such events and conditions include both changes in the retirement-benefit formula [citations], and also changes in the basis on which the retirement-benefit formula operates [citations]." (*Lehman, supra,* at p. 178.) The stream's volume at retirement may turn out to be less than feared, or to be even more than hoped for. (*Ibid.*) "That the nonemployee spouse might happen to enjoy an increase, or suffer a decrease, in retirement benefits because of postseparation or even postdissolution events or conditions is justified by the nature of the right to retirement benefits as a right to draw from a stream of income that begins to flow, and is defined, on retirement [citations], with the nonemployee spouse, at one and the same time, holding the chance of more [citations], and bearing the risk of less [citation], equally with the employee spouse. Because the nonemployee spouse is compelled to share the bad with the employee spouse [citation], he or she must be allowed to share the good as well." (*Id.* at p. 179.)

"The employee spouse is 'free[] to change or terminate . . . employment, to agree to a modification of the terms of . . . employment (including retirement benefits), or to elect between alternative retirement programs'—in a word, he or she is 'free[]' to 'define . . . the nature of the retirement benefits owned by the community.' [Citation.] [¶] But regardless how the employee spouse might choose to exercise such freedom, the 'nonemployee spouse owns an interest' in what he or she chooses by owning an interest in the community. [Citation.] [¶] It follows that a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits owns a community property interest in the latter's retirement benefits as enhanced. That is because, practically by definition, the right to retirement benefits that accrues, at least in part, during marriage before separation underlies any right to an enhancement. [Citation.]" (*Lehman, supra,* 18 Cal.4th at pp. 179–180.)

"[V]arious events and conditions after separation and even after dissolution may affect the amount of retirement benefits that an employee spouse receives. But not their character. Once he or she has accrued a right to retirement benefits, at least in part, during marriage before separation, the retirement benefits themselves are stamped a community asset from then on." (*Lehman, supra,* 18 Cal.4th at p. 183.)

" '[B]oth parties' rights are generally subject to changes in the terms of a retirement plan, as well as to circumstances largely beyond their control, such as the salary level finally achieved by the employee and used to calculate the pension benefit. *What the nonemployee spouse possesses, in short, is the right to share in the pension as it is ultimately determined* . . . . [Any] enhancement' in the amount is a 'modification of an asset not the creation of a new one.' " (*Lehman, supra,* 18 Cal.4th at p. 184, quoting *Olivo v. Olivo* (1993) 82 N.Y.2d 202, 209–210 [604 N.Y.S.2d 23, 624 N.E.2d 151].) "[A]n enhancement effected through 'additional years of service,' 'increase in earnings,' or 'increase in age' . . . is uncontestedly a community asset." (*Lehman, supra,* at p. 185, quoting *In re Marriage of Adams* (1976) 64 Cal.App.3d 181, 186 [134 Cal.Rptr. 298].)

 At the time the parties separated and thereafter when the judgment of dissolution was entered, Brian had been employed by the LAPD for over 30 years.[3] At that time he had reached his maximum retirement benefit level in his retirement tier, i.e., he would receive 70 percent of his salary as monthly pension payments. Thus, all of the 30 years of service necessary to qualify for the enhancement of moving to tier 5 (in which he could continue to make pension contributions until he reached 33 years of service, and thereby receive 90 percent of his salary in pension payments) had been during the marriage. Similarly, participation in the DROP required 25 years of service, all of which Brian acquired during the marriage. Victoria undisputedly owns a community property interest in Brian's retirement benefits, and therefore owns a community property interest in his retirement benefits as enhanced. Brian's right to participate in the DROP enhancement would not exist but for his having accrued the retirement rights that he did during the parties' marriage.

## II. Termination of Spousal Support

While we agree with the trial court's characterization of the DROP benefit as community property, we disagree with its interpretation of the language of the judgment of dissolution as applied to the situation presented. The question before us is whether, under the terms of the judgment, spousal support payments were to terminate at the time Brian entered the DROP and began receiving monthly credits to his DROP account, in which Victoria owned a 25 percent interest, or whether spousal support payments were to continue until Victoria actually began receiving her 25 percent interest in Brian's pension benefits. Answering that question involves our analyzing and interpreting the

---

[3] At the time of separation, February 14, 2000, he had been employed by LAPD for 30 years and 10 months.

terms of the settlement agreement and ensuing judgment of dissolution, a question of law, and a task which we undertake independently. We are not bound by the trial court's analysis and conclusions regarding the interpretation to be given the settlement agreement and judgment. (*Plaza Freeway Ltd. Partnership v. First Mountain Bank* (2000) 81 Cal.App.4th 616, 621 [96 Cal.Rptr.2d 865].)

"An MSA [marital settlement agreement] is governed by the legal principles applicable to contracts generally. (*In re Marriage of Hasso* (1991) 229 Cal.App.3d 1174, 1180 [280 Cal.Rptr. 919] . . . .) 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs [its] interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]' (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821–822 [274 Cal.Rptr. 820, 799 P.2d 1253].)" (*Tanner v. Tanner* (1997) 57 Cal.App.4th 419, 424–425 [67 Cal.Rptr.2d 204].)

Under the terms of the judgment of dissolution incorporating the marital settlement agreement (paragraph 1(A)), spousal support was to continue "until . . . the date [Victoria] *receives* the first payment that reflects her 25% interest in [Brian's] pension, and the gross amount of that payment exceeds $1,480.00 per month . . . at which time spousal support shall terminate forever." (Italics added.) In paragraph 1(C), the judgment provided that "[n]either the amount nor the duration of spousal support is modifiable under any circumstances . . . . In the event [Brian] pays spousal support to [Victoria] for a month in which [Victoria] *receives* her 25% interest in [Brian's] pension and the gross amount she receives exceeds $1,480.00, [Victoria] shall immediately reimburse the spousal support she received for that month to [Brian]." (Italics added.) The parties agreed that Brian's pension "shall be divided 75% to [Brian] and 25% to [Victoria]."[4]

The trial court concluded that once Brian began participating in the DROP, Victoria was not entitled to collect monthly spousal support and also eventually collect her 25 percent interest in the monthly pension payments credited to Brian's DROP account. In the court's view, this would constitute a

---

[4] This portion of the judgment varies from the typical arrangement under which a "time rule" is applied which apportions the pension amount as between time worked during the marriage versus time worked after separation. "Under that method, the community property interest in retirement benefits is the percentage representing the fraction whose numerator is the employee spouse's length of service during marriage before separation, . . . and whose denominator is the employee spouse's length of service in total . . . ; the separate property interest is the percentage representing the remainder of 100 percent *minus* the community property interest percentage." (*In re Marriage of Lehman, supra,* 18 Cal.4th 169, 176.) Here, no apportionment calculation is necessary because the parties agreed that Victoria's community property interest in Brian's total retirement benefits is 25 percent.

"double-dip" and "overreaching" beyond the parties' contemplation in agreeing to the terms of the judgment of dissolution. The court based its conclusion on paragraph 1(c) of the judgment, "In the event [Brian] pays spousal support to [Victoria] for a month in which [Victoria] receives her 25% interest in [Brian's] pension and the gross amount she receives exceeds $1,480.00, [Victoria] shall immediately reimburse the spousal support she received for that month to [Brian]."

The judgment requires that Brian continue to pay spousal support "until . . . the date [Victoria] *receives* the first payment that reflects her 25% interest in [Brian's] pension." A monthly credit being made to Brian's DROP account does not constitute Victoria receiving a payment reflecting her interest in his pension. The DROP account could not be distributed until Brian left employment with the LAPD. Therefore, the so-called reimbursement clause was not triggered. Brian did not pay spousal support to Victoria for a month in which she "received" her 25 percent interest in his pension. The DROP was simply an enhancement to Brian's retirement benefits, which induced him to continue working for the LAPD rather than retiring when eligible and actually drawing monthly pension payments, and also working elsewhere to earn a salary. The DROP account was essentially a promise of future payment at the time Brian actually left employment; indeed under certain circumstances he could have forfeited the DROP account, for example, by taking disability retirement. Neither Brian nor Victoria actually received pension payments within the contemplation of the judgment when Brian began participating in the DROP. The final sentence of paragraph 1(C) clearly was intended to address the situation in which Brian made a spousal support payment to Victoria without knowing that she had in the same month received a payment for her interest in his pension.

Essentially what Brian requested was that he be allowed to force Victoria to accept monthly payments of 25 percent of the credits made to his DROP account. There is no support in the law of this state nor in reason for permitting him to do so.[5] The trial court reasoned that his decision was "a reverse of Gil[l]more," referring to *In re Marriage of Gillmore, supra,* 29 Cal.3d 418 *(Gillmore).* We find no support for the trial court's order in the holding or underlying rationale of *Gillmore.*

---

[5] We note that under the trial court's order, she was not even receiving the amount of the pension payment to which she was entitled (approximately $1,720), but was merely receiving the spousal support amount ($1,480). The DROP account earned 5 percent interest and annual cost of living adjustments, but Brian had the present use of the extra $240 or so, which is not accounted for by 5 percent interest. In effect she was merely receiving spousal support, while also being deprived of a substantial portion of her community property interest in the DROP account.

In *Gillmore*, the Supreme Court held that a former wife could elect to begin receiving payments representing her community property interest in her former husband's pension as soon as he became eligible to retire, whether or not he actually retired. The court reasoned: "Under the cases and statutory law, [husband] cannot time his retirement to deprive [wife] of an equal share of the community's interest in his pension. It is a 'settled principle that one spouse cannot, by invoking a condition wholly within his control, defeat the community interest of the other spouse.' [Citations.]" (*Gillmore, supra,* 29 Cal.3d at p. 423.) By continuing to work, the employee spouse would subject the nonemployee spouse to the risk of losing the pension completely if the employee spouse were to die while still employed. Although the employee spouse has every right to choose to postpone the receipt of his or her pension and to run that risk, he or she should not be able to force the nonemployee spouse to do so as well. (*Id.* at p. 424.)

The court made clear that the nonemployee spouse can make an election. "[T]he nonemployee spouse may choose to wait, preferring to receive the retirement benefits when the employee spouse actually retires. The nonemployee may thereby ensure some protection for the future and may be able to share in the increased value of the pension plan. [Citation.] However, if the nonemployee spouse chooses to receive immediate payments, as [wife] does, he or she has a right to do so. Any inequities caused by the immediate distribution of retirement benefits can be resolved through adjustments in spousal support."[6] (*Gillmore, supra,* 29 Cal.3d at p. 428, fn. omitted.)

"The employee spouse retains the right (1) to change or terminate employment; (2) to agree to a modification of the retirement benefits; or (3) to elect between alternative benefits. [Citation.] '[T]he employee spouse retains the right to determine the nature of the benefits to be received.' [Citation.]" (*Gillmore, supra,* 29 Cal.3d at p. 425.)

The only guidance to be gleaned from *Gillmore* as applicable to the case before us is that Brian cannot *force* Victoria to elect to begin receiving payments which he designates to be pension payments in order to terminate the spousal support payments. He cannot invoke a condition wholly within his control to defeat Victoria's community property interest in his DROP

---

[6] In footnote 9, the court clarified that the nonemployee spouse "cannot have it both ways. The decision to ask for distribution of the retirement benefits before the employee spouse actually retires 'constitutes an irrevocable election to give up increased payments in the future which might accrue due to increased age, longer service and a higher salary.' [Citation.] Thus, if [wife] chooses to receive her share of the retirement benefits immediately, she will forfeit her right to share in the increased value of those benefits in the future." (*Gillmore, supra,* 29 Cal.3d at pp. 428–429.)

account. That result is not supported by either the language of the judgment or the existing case law. Under *Gillmore*, it is the nonemployee spouse who gets to make an election and take her chances. The DROP benefit differs from the benefits at issue in *Gillmore* in that the future enhancement of benefits is largely certain rather than speculative (except with regard to the availability and amount of future cost of living adjustments), but that does not mean that the nonemployee spouse should lose her right to choose.

According to Brian, "It was the understanding and agreement of both parties that though Brian could remain employed and continue to earn a salary after retirement that his obligation to pay Victoria spousal support would terminate nonetheless." He claims Victoria's attorney confirmed this understanding prior to execution of the agreement in a letter to Brian's counsel, saying she advised Victoria "not to agree to a permanent waiver of spousal support upon receipt of her share of [Brian's] pension benefits" because Brian could "be drawing his pension, and possibly, holding another full-time job." Despite the admonition, Victoria advised her attorney that "she made an agreement with [Brian] and is prepared to abide by that agreement."

But the current situation is different than the one within the parties' contemplation. The exceptional benefits at issue here became available *only* because he continued to work for the same employer where his retirement benefits accrued during the lengthy marriage, thus rendering the enhanced benefits community property. Had he retired from the LAPD and changed jobs, he would have actually received pension payments (in which Victoria would have *received* her interest), and spousal support would have terminated. Under the circumstances in which they now find themselves, both Brian and Victoria are entitled to enjoy the enhancement in Brian's benefits, because those benefits are community property.

In summary, Victoria should not have been ordered to reimburse Brian out of her share of the community property DROP account, for the spousal support payments she received after he began participating in the DROP. Pursuant to the terms of the judgment, she was entitled to receive her full 25 percent interest in the DROP account once Brian left the employ of the LAPD and the proceeds of the DROP account became available for distribution.

## DISPOSITION

The domestic relations order of June 5, 2003, is reversed and the matter remanded to the trial court with directions to delete paragraph 6 of the order. Appellant is awarded costs on appeal.

Epstein, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied August 16, 2004, and respondent's petition for review was denied October 13, 2004.