Filed 10/6/20  Marriage of Feng and Tian CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of JINGTAO FENG and LI TIAN. | |
| JINGTAO FENG,    Appellant,       v.  LI TIAN,    Respondent. | G057949  (Super. Ct. No. 17FL000060)  O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jonathan H. Cannon, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed as modified.

Law Office of Alan S. Yockelson, Alan S. Yockelson; Hittelman Strunk Law Group and Steven G. Hittelman for Appellant.

Holstrom, Block & Parke and Ronald B. Funk for Respondent.

\*          \*          \*

Jingtao Feng (Husband) and Li Tian (Wife) divorced in China, and executed a written divorce agreement purporting to divide all of their property. A California court later determined that one piece of real property in California and one investment in a business in the United States (neither of which had been specifically mentioned in the parties' written divorce agreement) were Wife's separate property. Substantial evidence supports the trial court's finding that the real property was Wife's separate property, but does not support the finding that the business investment was Wife's separate property. The business investment is properly categorized as community property.

The trial court found that Husband breached his fiduciary duty to Wife by encumbering her separate property without her knowledge or consent, and permitting her properties to be lost to foreclosure. The trial court's findings regarding the breach of fiduciary duty claims are supported by substantial evidence.

We reverse the trial court's finding that the business investment was Wife's separate property, and instead conclude that the business investment is the parties' community property. As modified, we affirm the judgment.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.

### THE PARTIES

Husband and Wife married in the Republic of China in February 2003. They owned numerous businesses and properties in China and in the United States. One of these businesses was Wuhan Yiyang Technology Company, Ltd., a Chinese company in the business of sterilizing and disinfection (Wuhan Yiyang);[1] at the time of their

---

[1] The name of this business is also identified as Wuhan Yihang in the appellate record; for consistency, we will use the spelling Wuhan Yiyang, which is the most common spelling in the record.

divorce, 80 percent of the shares of the company were held in Husband's name, and the other 20 percent were held in Wife's name. Another of their businesses was Wuhan Juirui Electric Co. Ltd., a Chinese company in the business of manufacturing large equipment (Wuhan Juirui). At all relevant times, Wuhan Juirui was owned 90 percent by Wuhan Yiyang, and 10 percent by Husband. The other properties and businesses that are relevant to this appeal will be discussed in detail *post*.

Husband and Wife separated after she learned he'd had a child with another woman. At the time, Husband and Wife had one minor child. They executed a voluntary divorce agreement in China in March 2015 terminating their marriage, providing for child custody and support, and allocating their properties. The divorce agreement provided that, with one exception not relevant to the issues in this case, all "community-owned real estate property will be divided according to the name on the deed for each respective property." The divorce agreement also provided, with regard to the parties' business interests: "Disposition of Claims and Liabilities of Debts: The entirety of company equity, claims and liabilities of debts will belong to the possession of the male party."[2] Other than the one piece of real property specifically awarded to Husband, the divorce agreement did not identify any real or personal property, or any business interests. Wife understood that the reference to the "entirety of company equity, claims, and liabilities of debts" was a reference to Wuhan Yiyang and Wuhan Juirui. Husband understood the divorce agreement to also refer to a company in the United States, CMB Infrastructure Investment Group VII, LP, which is discussed in more detail *post*.

---

[2] The later Chinese judgment translated this as "all stock rights as well as credits and debts of the company."

3

Wife was awarded physical custody of the minor child; Husband agreed to pay 5,000 RMB per month in child support,[3] in addition to tuition and medical expenses, and was entitled to visitation.

At the end of the divorce agreement, both parties wrote out and signed the following statement: "I voluntarily divorce, I completely agree with each item of this agreement, and additionally I have no other objections."

## II.

### THE ALLIUM PROPERTY

In September 2014, Wife took title to the real property located on Allium in Irvine (the Allium property) as her sole and separate property. Husband signed two interspousal transfer deeds confirming that the Allium property was Wife's separate property.[4] Husband testified no one told him the legal consequences of his signing the interspousal deed transfers. Husband also testified that in China, all property is owned 50/50, no matter which spouse has title to the property. Wife paid all encumbrances, taxes, insurance, association fees, and maintenance costs for the Allium property.

In July 2015, Wife transferred title to the Allium property to the Tree Family Living Trust, of which Wife's brother is the trustee. The trust sold the property in April 2017. Husband put a lien on the property, and the sales proceeds were transferred to an attorney trust account.

---

[3] RMB stands for renminbi, the currency of China. (*Xun Li v. Holder* (9th Cir. 2009) 559 F.3d 1096, 1101, fn. 5.) The yuan is the principal unit of that currency. (*Southgate Master Fund v. United States* (N.D. Tex. 2009) 651 F.Supp.2d 596, 602.) The equivalent of 5,000 RMB at the time of the trial was $762.68 in United States dollars.

[4] One interspousal deed was signed in April, when the parties first acquired the vacant lot on Allium, and one was signed in September when escrow closed on the new home built on the lot.

III.

## CMB INFRASTRUCTURE INVESTMENT GROUP VII, LP

In October 2011, Wife invested $535,000 in CMB Infrastructure Investment Group VII, LP (CMB), which constituted a .444% interest in the company, in order to obtain conditional resident status in the United States for herself, Husband, and their minor child, as an alien investor. The United States Citizenship and Immigration Services approved the alien investor petition on June 12, 2012, and the parties were granted conditional resident status in April 2013. In January 2015, Wife filed a petition by an investor to remove the conditions on the parties' resident status. In February 2016, the conditional basis on the resident status was removed, and the parties and the minor child became permanent residents.[5]

The money for the CMB investment came from shareholder loans made to Husband and Wife by Wuhan Yiyang. These loans, totaling 4,500,000 RMB, were secured by the parties' shares in Wuhan Yiyang. At the time the CMB investment was made, Wife held 80 percent of the company's shares, while Husband held 20 percent. Wife testified the loans from Wuhan Yiyang were to be repaid with dividends from CMB. Husband testified Wuhan Yiyang did not have cash on hand to loan to the parties, so the company took out a loan from a bank. No other evidence was presented as to the terms of the Wuhan Yiyang loans to Husband and Wife, or the loan Wuhan Yiyang obtained from a bank.

IV.

## REAL PROPERTIES IN CHINA

Based on the terms of the divorce agreement, Wife received the following properties in China as her sole and separate property:

---

[5] Trial exhibit A suggests that Husband did not receive permanent residency status, but Husband testified that he did.

(1) 1F-2 Shop of Building, Baoan-Jiangnan 2nd Term, Nanhu Village (South of Wuliang Highway), Hongshan District. At the time the divorce agreement was signed, the fair market value of the property was $470,000, and the property was owned free and clear.

(2) 1F-15 Garage of Building No. 1, Baoan-Jiangnan 2nd Term, Nanhu Village (South of Wuliang Highway), Hongshan District. The property had a fair market value of $50,000, and was owned free and clear.

(3) 1-3/F-19, Building 5, Qianyuewan, Biguiyuan, No. 1, Chuantoushan, Dongjing Street, Hannan District, Wuhan. The property had a fair market value of $450,000, and was owned free and clear.

(4) 2F-C263 Central Mall, Hansheng Street, Qiaokou District. The property had a fair market value of $600,000, and was mortgaged. Wife claims Husband took out the mortgage on this property for the benefit of the company, but the house mortgage record information sheet attached to Husband's request for order lists Wife as the debtor.

(5) 7-2-101 Dingxiangyuan, Dongfeng Yangguangcheng, 17R Block of Wuhan Economic & Technological Development Zone. The property had a fair market value of $450,000 at the time of the divorce, and was mortgaged. Again, Wife claims Husband took out the mortgage on this property, but she is listed as the debtor.

In March 2013, Husband and Wife had signed a series of powers of attorney authorizing another individual to act on their behalf in obtaining loans for which they would cosign, and for which the five properties would be used as collateral.[6] Husband testified that all of the properties already had loans taken out against them before the divorce agreement was signed.

---

[6] The powers of attorney identified other properties that would be used as collateral for obtaining loans; we presume these properties were transferred to Husband as part of the divorce agreement.

6

Wife's properties (1), (2), and (3) were pledged by Husband for lines of credit taken out by Wuhan Juirui. The loan document dated May 4, 2015, stated that Wife agreed to be the guarantor of the loans; Wife testified the signature on the document was not hers, and a fingerprint expert testified the thumbprint on the document did not belong to Wife.

Wuhan Juirui and Wuhan Yiyang defaulted on the loans and all of Wife's properties were lost to foreclosure.

PROCEDURAL HISTORY

I.

*LEGAL ACTIONS IN CHINA*

Wife brought a lawsuit against Husband in China in March 2016 for unpaid child support. Husband claimed that he did not owe the child support specified in the divorce agreement because Wife and the child had moved to the United States and Husband could not have visitation. In March 2016, the Chinese court reaffirmed that Husband owed Wife 5,000 RMB per month for support of the minor child, and determined the amount of arrears owed by Husband was 40,000 RMB.

Husband claimed he was unable to act on behalf of Wuhan Juirui and Wuhan Yiyang because Wife refused to sign documents or take other actions necessary to transfer control of the companies. Husband therefore obtained a judgment against Wife in China in May 2016 requiring her to transfer ownership of her shares in Wuhan Yiyang to Husband. The judgment concludes, "the divorce agreement . . . expresses [the] real intent of both parties . . . . The agreement shall be valid herein and be binding on [Husband] and [Wife] and both parties shall perform liabilities in line with the agreement." The judgment ordered Wife, in part, to transfer her shares in Wuhan Yiyang to Husband; the judgment did not address Wife's role as the legal representative of the company.

7

Husband then obtained an execution order, which he used to get necessary paperwork through various government entities. The execution order changes ownership of 20 percent of the equity of Wuhan Yiyang from Wife to Husband; like the judgment, it does not mention Wife's status as the company's legal representative.

## II.

### LEGAL ACTIONS IN CALIFORNIA

Husband filed a petition for joint physical and legal custody of the minor child in the Superior Court of Orange County in March 2017. In his petition, Husband asked the court to determine ownership of the Allium property, CMB, and three bank accounts that he claimed had not been divided by the divorce agreement. In July 2017, Wife filed notice of registration of the foreign support judgment, consisting of the divorce agreement and the Chinese civil judgment.

In October 2017, Wife filed a request (1) for child custody, (2) to determine arrears, (3) for attorney fees and costs, (4) to determine that the Allium property was Wife's separate property and that the proceeds from the sale of the Allium property were her separate property funds, (5) to determine that the interest in CMB was Wife's separate property, and (6) to find that Husband breached his fiduciary duties to Wife by encumbering and permitting foreclosure of Wife's separate real estate properties in China.

The parties stipulated to permit a retired judge to act as a temporary judge to resolve their disputes. Following an evidentiary hearing, the trial court issued a statement of decision. The statement of decision was revised after Wife filed a brief regarding attorney fees and costs. Husband then filed objections to the statement of decision. The court amended the statement of decision, but otherwise denied Husband's objections.

The trial court issued findings and orders after the hearing. As relevant to the issues in this appeal, the court found: (1) "The $500,000 investment in CMB

8

Infrastructure Investment Group plus the approximate $35,000 in management fees is found to be [Wife]'s separate property and is awarded to her as her sole and separate property"; (2) "the [Allium] property . . . [was] conveyed by the parties to [Wife] as her separate property. Thus, Allium sale proceeds, including the HUD refund are [Wife]'s sole and separate property. As each party previously received a disbursement of $179,353.50 from the Allium sale proceeds, [Husband] must repay $179,353.50 to [Wife] as a return to her of her separate property payable forthwith"; (3) "[Husband] pledged to the bank in China, without [Wife]'s knowledge or consent, three of [Wife]'s China real properties previously awarded to her. They were subsequently lost in foreclosure. [Husband] also failed to pay the encumbrances on two additional China real properties previously awarded to [Wife]. The Court finds this conduct to be [a] breach of [Husband]'s fiduciary duties to [Wife]. These five (5) real properties were previously awarded to [Wife] under the terms of the parties' Voluntary Divorce Agreement/Chinese Judgment. [Husband]'s breach of his fiduciary duties to [Wife], directly resulted in [Wife] being financially damaged in the sum total of $2,020,000. [Husband] is ordered to pay [Wife] this amount payable forthwith."

Husband filed a timely notice of appeal.

DISCUSSION

I.

*STANDARD OF REVIEW*

We review the record to determine whether substantial evidence supports the trial court's findings. (*People v. Semaan* (2007) 42 Cal.4th 79, 88; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)[7]

---

[7] *In re Marriage of Lehman* (1998) 18 Cal.4th 169, on which Husband relies for his argument that this court should independently review the trial court's findings regarding the nature of the property, is not on point. In that case, the Supreme Court considered the following question: "Does a nonemployee spouse who owns a community property interest in an employee spouse's retirement benefits under such a plan own a community

## II.

### *THE ALLIUM PROPERTY*

We begin with the presumption that all property acquired during marriage is community property. (Fam. Code, § 760.) The parties were domiciled in California when the Allium property was purchased. Community property may be transmuted to the separate property of either spouse (*id.*, § 850, subd. (a)) if the transmutation is "made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected" (*id.*, § 852, subd. (a)).

In *In re Marriage of Kushesh & Kushesh-Kaviani* (2018) 27 Cal.App.5th 449, 456, another panel of this court held that a standard interspousal transfer grant deed meets the requirements to transmute property. "[Interspousal transfer grant deeds] are not only title documents. They are also writings that expressly transfer spousal interests, in which spouses unequivocally make 'interspousal' transfers to another . . . by way of the traditional word for a conveyance—a 'grant.' They don't just *reflect* title. They use a verb—'grant'—to *convey* title." (*Ibid.*) The appellate court remanded that case to the trial court to make factual findings as to whether (1) the transmutation gave one spouse an unfair advantage over the other, (2) a rebuttable presumption of unfair advantage had therefore arisen, and (3) the presumption had been rebutted. (*Id.* at pp. 456-457.)

In this case, the two interspousal transfer grant deeds met the requirements to transmute the Allium property to Wife's separate property. Further, the trial court found that Wife had overcome the presumption of undue influence, based on the parties'

---

property interest in the retirement benefits as enhanced?" (*Id.* at p. 174.) The court explained that the question was one solely of characterization: "[W]hether the enhancement was a community asset in any part, and not apportionment, i.e., to what extent the enhancement, if a community asset at least in some part, belonged to the community and separate estates." (*Id.* at p. 176.) The appellate court's review of this characterization was de novo. (*Id.* at p. 184; see *In re Marriage of Davis* (2004) 120 Cal.App.4th 1007, 1015 [same].)

testimony and the divorce agreement's provision that "[a]ll other community-owned real estate property will be divided according to the name on the deed for each respective property," without reference to the country in which such property was held. Husband's claim that he did not understand the significance of the interspousal transfer grant deeds because they were written in English was negated by the clear intent of the divorce agreement, written in Chinese, that all real property was to be divided based on the name of the party on title to the property.

Further, Wife testified that the one piece of real property specifically mentioned in the divorce agreement was transferred to Husband to account for the fact that Husband knew Wife would be awarded the Allium property as part of the divorce settlement.

Substantial evidence supported the trial court's finding that the Allium property was Wife's separate property, and the sales proceeds from the sale of the Allium property belonged to her.

The majority of Husband's appellate argument focuses on the tracing of the money used by the parties to acquire the Allium property.[8] Because Wife established a transmutation of the property to her separate property, and rebutted the presumption of undue influence, any failure to trace the money used to acquire the property is irrelevant.

---

[8] The parties provided contradicting testimony regarding the source of the $400,000 down payment on the Allium property. Both agreed that a portion of the down payment came from a return of their investment in Top Holdings, LLC, a real estate investment company. Wife testified the remainder of the down payment came from a loan from her brother. Husband testified the remainder of the down payment came from the parties' joint bank account and money Husband wired from China.

The majority of the money for the Top Holdings, LLC investment came from a loan backed by another piece of real property they owned in the United States; Wife testified the remainder came from her individual bank account, and a loan from her brother, while Husband testified the remainder came from a loan from Wuhan Yiyang.

III.

*CMB INFRASTRUCTURE INVESTMENT GROUP VII, LP*

The parties did not specifically discuss what would happen to the CMB investment at the time they negotiated their divorce settlement in China. Wife testified CMB is now her separate property because the investment was placed in her name and because Wife gave up her investment in Wuhan Yiyang as part of the divorce. Husband counters that he is entitled to the value of the CMB investment ($500,000) because the divorce agreement awarded him the equity ownership, claims, and debts of all companies, including CMB.

The amended statement of decision makes the following factual findings regarding the ownership of the CMB investment: "In October of 2011 as part of [Wife] obtaining a United States Visa, a $500,000 capital contribution, plus approximately $35,000 in management fees, was paid to CMB Infrastructure Investment Group. The money came from a loan that was the result of [Wife] pledging her stock in one of the Companies owned by the parties. The Visa was obtained in her name alone, to obtain permanent residency in the United States. The parties divided their assets per the Chinese [divorce agreement] (Ex. #2) as confirmed in the Chinese Judgment (Ex. #3). This Judgment controls under the principle of comity. The fact that the parties stipulated therein that they 'completely agreed' with its terms and the exhibit being admitted into evidence, gave the companies in China to [Husband] including all of the debts. No mention was made that [Wife] should have to reimburse the company for the loan proceeds. Therefore, the loan proceeds became [Wife]'s separate property upon the division of assets. [¶] Therefore, the court finds that the CMB investment is the separate property of [Wife]." The trial court's findings as to the CMB investment are not supported by the evidence, and must be reversed.

12

The CMB investment was made using community funds, and was made in Wife's name for the benefit of the community.[9] The parties agree that the divorce agreement provides that Wuhan Yiyang was awarded to Husband, along with its equities, debts, and claims. Therefore, the repayment of the loan from CMB to Wuhan Yiyang would belong to Husband, and the loan from the bank to Wuhan Yiyang is also Husband's responsibility. Wife agreed that if the parties' loan from Wuhan Yiyang were not repaid, their shares would be forfeited back to the company. Of course, Wife's shares have all been transferred to Husband, so it is now only his shares that are technically at stake.

While the trial court found that the divorce agreement did not specify that Wife must reimburse the company for the loan proceeds, the fact that it does transfer the company's "claims and liabilities of debt" to Husband indicates the parties were aware of claims the company had, including its claim on the loan made to acquire the CMB investment.

Husband's contention that CMB was awarded to him in the divorce agreement is unsupported by the evidence. CMB was not a business owned by the parties; it was a .444 percent investment in a company. While Husband twice sought the intervention of the Chinese courts to compel Wife to transfer her shares in Wuhan Yiyang to him, he never mentioned the interest in CMB, which he now claims is subject to the same provision of the parties' divorce agreement. We conclude that the CMB investment was not intended by the parties to be a company whose equity, claims, and debts were awarded to Husband under the terms of the divorce agreement.

This leaves us with the question of how to categorize the CMB investment. The investment was made with community funds during marriage. Both parties agree that under Chinese law, all property owned by a married couple is owned 50/50, despite

---

[9] The community property presumption does not apply to the investment in CMB because neither party was domiciled in California at the time the investment was made.

13

how title is held.  Because the divorce agreement does not address the CMB investment, it should be characterized as a community property asset.

## IV.

### *BREACH OF FIDUCIARY DUTY*

Spouses have a fiduciary duty to each other with regard to their properties during the marriage and throughout the dissolution process.  (See Fam. Code, §§ 721, 1100, 2100.)  The trial court found that Husband violated his fiduciary duty to Wife by encumbering the properties that had been awarded to Wife as her separate property, without her knowledge or consent, and by failing to make the loan payments on those properties, causing them to be lost to foreclosure.

In the statement of decision, the trial court made the following factual findings regarding this issue:  "As it turns out, three of [Wife]'s properties were pledged as security for a line of credit benefitting [Husband]'s company.  This was done after the [divorce agreement] was entered into and without [Wife's] knowledge or consent as per [Wife]'s testimony and that of a fingerprint expert who testified it was not [Wife]'s fingerprint on the loan documents.  [Husband] defaulted on the repayment of the line of credit and the properties were lost in foreclosure to the Bank.  Further, the other two properties had encumbrances which the [Husband] failed to pay, as required per the [divorce agreement], resulting in the loss of these properties as well.  In total the [Wife] testified that the properties foreclosed on were worth $2,020,000 which testimony was unrebutted.  [¶] [Husband] testified that these losses were the fault of the [Wife]'s failure to cooperate in changing the ownership of the companies.  However, it was not until all of the properties belonging to the [Wife] were foreclosed on that he decided to go to court in China and get ownership of the stock in the companies changed.  As there was no adequate explanation for the delay, the Court finds [Husband]'s testimony lacks credibility.  The Court finds that the [Husband] breached his fiduciary duty to the [Wife] and that he must repay her for her losses in the amount of $2,020,000."

14

In May 2015, Wuhan Juirui and Wuhan Yiyang obtained loans in the amount of 100 million RMB, or about $1.6 million. Wife's three previously unencumbered properties in China (identified *ante* as properties (1), (2), and (3)), were pledged as security for the loans. Wuhan Yiyang and Wuhan Juirui defaulted on the loans, and Husband did not advise Wife of the default. Because the loans were not repaid the properties were seized and sold by the Chinese court.

Wife's testimony was unequivocal about her lack of knowledge of or involvement with the loans using her properties as collateral. Wife did not sign any loan applications for Wuhan Yiyang or Wuhan Juirui between 2013 and December 2014. Wife was unaware of any loan applications in 2014, and did not recall her properties having been used as collateral before the divorce agreement was signed. Wife never authorized Husband to use her properties as security for any loans, and had nothing to do with Wuhan Juirui after the divorce. Wife testified that the signature, thumbprint, and guarantee on the loan documents was not hers.[10] Wife never received any documents or forms related to the businesses after the divorce.

Husband did not dispute that Wife's properties were used as collateral for loans taken out by Wuhan Yiyang and Wuhan Juirui, or that the loans were defaulted on and the properties were seized and sold. Husband raised several other defenses to the claim of breach of fiduciary duty.

First, Husband claims the loans were taken out before the divorce. But Husband's fiduciary duty to Wife was in existence during the marriage. Even when the properties were held by the parties 50/50 (despite title being in Wife's name), using the properties as collateral for a loan without Wife's knowledge and consent would be a breach of fiduciary duty.

---

[10] An expert in forensic science with training in fingerprint work testified that the thumbprint on the loan application for Wuhan Yiyang was not Wife's thumbprint. The thumbprint was not Husband's either.

15

Husband also claims he was unable to pay or renegotiate the loans because Wife was the legal representative of the companies and was running the companies between 2015 and 2018. The evidence does not support Husband's contention. We first note that Husband was at all relevant times the legal representative of Wuhan Juirui. Husband offers no explanation of how Wuhan Yiyang could continue to operate as a company, when Wife testified she had nothing to do with the companies after the divorce. Wife countered Husband's testimony that she had failed to sign documents necessary for Husband to operate the companies. Finally, when Husband points to the Chinese judgment and the execution order as proof that Wife failed to comply with the divorce agreement, we note that the judgment and order only addressed the transfer of shares of Wuhan Yiyang, not the change of the legal representative.

Husband also testified that, despite the fact he was awarded both the assets and the debts of Wuhan Yiyang and Wuhan Juirui in the divorce agreement, the loans to those companies were actually Wife's responsibility because they were obtained by the companies while Wife was the legal representative. Wisely, Husband does not pursue this argument on appeal.

In the statement of decision, the trial court found that Husband's "testimony lacks credibility" because Husband failed to explain why he delayed in seeking help from the Chinese court to change the ownership of the companies until after Wife's properties had been foreclosed on. In his appellate briefs, Husband spends much time on the timeline of the foreclosure dates compared to his request for a judgment and execution order in China. Husband initiated the Chinese action to enforce the divorce agreement against Wife on June 23, 2015; the judgment was issued on May 25, 2016. Properties (4) and (5) were foreclosed in July 2015; properties (1) and (2) were foreclosed in April 2016, and the foreclosure date for property (3) is unknown (but the fact of foreclosure is undisputed). Although Husband is correct that none of the foreclosures occurred before he initiated the Chinese action, this invites the question why

16

he waited until one month before the first of the foreclosures to act. The trial court's finding that Husband delayed in seeking relief from the courts is supported by the reasonable inference that the process leading to foreclosure began before the actual foreclosure date.

Husband's appellate briefs contain speculation and conjecture, such as "it is possible that Wife permitted . . . ," and "it is not firmly established that the loans were acquired after the divorce." Wife presented substantial evidence supporting her claim for breach of fiduciary duty.

DISPOSITION

The trial court's finding that the investment in CMB Infrastructure Investment Group VII, LP is the separate property of respondent Li Tian is reversed. The trial court shall enter a judgment finding that the investment in CMB Infrastructure Investment Group VII, LP is the parties' community property. In all other respects, the judgment is affirmed. Because both parties prevailed in part, neither party shall recover costs on appeal.


FYBEL, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.

17