Filed 9/16/16  Marriage of Kassel CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of ROBERT I. and CAROLINE KASSEL.<br><br>ROBERT I. KASSEL,<br><br>    Respondent,<br><br>      v.<br><br>CAROLINE KASSEL,<br><br>    Appellant. | G050803<br><br>(Super. Ct. No. 09D004196)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Glenn R. Salter, Judge.  Reversed.

Phillips Whisnant Gazin Gorczyca & Curtin, and J. Benedict Phillips for Appellant.

StephenTemko for Respondent.

\*        \*        \*

Caroline Kassel appeals from the postjudgment order granting the petition of her ex-husband Robert I. Kassel to terminate spousal support. The court found she had cohabitated with her boyfriend David Williams within the meaning of their marital settlement agreement (MSA) allowing spousal support obligations to "cease to be due" upon Caroline's "cohabitation." The court did not award attorney fees or costs to either party.[1]

Caroline contends the order should be reversed for several reasons. First, there was insufficient evidence of cohabitation. Second, the court should not have terminated its jurisdiction over spousal support because the marriage was of long duration and there was no contrary written agreement or court order. Third, the court should have set aside the judgment rather than terminate its jurisdiction. And fourth, it should have awarded her attorney fees and costs.

We conclude the evidence was sufficient to support a finding of cohabitation for the purpose of invoking the rebuttable presumption under Family Code section 4323, subdivision (a)(1), that Caroline's need for support had decreased. The MSA, however, treated cohabitation and remarriage identically. For that reason, we conclude that the characteristics of the cohabitation, as that term is used in the MSA, are the same as found in a relationship, akin to marriage, by which each partner by words or conduct has evidenced a commitment to care for the other, such that Caroline is no longer in need of support from Robert. The court made no finding that Caroline's alleged cohabitation with Williams was of that quality. Accordingly, we reverse for a new trial to determine whether Caroline's cohabitation was such a relationship resulting in the loss of any need for Robert's support. It follows that we must also reverse the court's finding that its jurisdiction over this long term marriage was terminated.

---

[1] For ease of reference and clarity, we will refer to the parties by their first names. No disrespect is intended.

FACTS AND PROCEDURAL BACKGROUND

The parties married in June 1991 and separated in May 2009. They entered into a marital settlement agreement (MSA) in May 2012, that was incorporated into a judgment of dissolution filed in June 2012. At issue is the following provision: "[Section 2.5.3] The spousal support payments required by Section 2.5.2 shall cease to be due on the earliest of the death of [Robert], the death of [Caroline], the cohabitation of [Caroline] or the remarriage of [Caroline]."

*The Competing Requests for an Order* (*RFO*)

In July 2013, Robert filed a RFO to terminate spousal support based on Caroline's alleged cohabitation with someone. Caroline filed a responsive declaration denying she had "cohabitated with another person at any point in time after the Judgment was filed." She attested she had not shared her residence with anyone other than her children, that although Williams had previously been her boyfriend, he never lived with her and they were no longer in a relationship. She believed he had an apartment in Aliso Viejo, as well as "a place [to] stay with his mother . . . ." In her supporting points and authorities, Caroline argued the word "cease" meant "suspend," not "terminate," and she had not waived her right to spousal support or agreed that it be terminated upon cohabitation. Caroline requested attorney fees and sanctions.

Robert's reply declaration also requested sanctions because Caroline's statements were false and controverted by other evidence. In August 2012, only three months after the MSA was signed, Robert hired an investigator who reported he saw Williams' car "coming and going from [Caroline's] residence" and spending the night on almost a daily basis. Surveillance showed this again in October and December 2012, as well as February, March, April, May, and June 2013. On multiple occasions, Williams was observed leaving Caroline's residence "wearing different clothes" from the night

3

before although he had "never been seen carrying a suit case." Additionally, Robert received three AAA insurance cards, available only to members of the same residence, and one of which had Williams' name on it. Robert also received a holiday card from his former sister-in-law, which stated "From our family to yours" and included a photograph showing Williams standing next to Caroline. He opposed Caroline's request for attorney fees.

In October 2013, the parties stipulated, and the court ordered, the parties would testify in person at the hearing on Robert's RFO, the testimony of third party witnesses would be submitted through their depositions in lieu of live testimony, rulings on legal issues would be made after presentation of evidence regarding cohabitation, and spousal support for October 2013 forward would be paid into a trust account, with $10,000 to be paid to Caroline's counsel subject to the court's ruling after the hearing. The hearing on Robert's RFO was continued to March 13, 2014.

In November 2013, Caroline filed her own RFO for attorney fees and for an upwards modification of spousal support. She conceded that if the court found she had cohabitated, she would not be entitled to spousal support during the period of cohabitation but believed her support would only be suspended, not terminated. Although she admitted she had been in a relationship with Williams for two years, she denied having been in one with him since August 2013 or ever cohabitating with him. She requested that, if the court determined she had cohabitated with him, to find that was no longer the case, order her spousal support be suspended for the period of cohabitation, and to make a new support order.

At the initial hearing on Caroline's RFO, the parties stipulated to the amounts Robert had the ability to pay for spousal support and towards Caroline's attorney fees and costs, and that the fee was "financially reasonable . . . should the [c]ourt make" such an award. The court so ordered and made no other findings at that time.

4

Both parties requested a statement of decision on the issues of spousal support, cohabitation and attorney fees.

*The Court's Ruling*

At the March 2014 trial on the RFOs, the court heard testimony and admitted into evidence numerous deposition transcripts, investigative reports, and miscellaneous exhibits, and took judicial notice of various declarations, stipulations of the parties. After trial, the court took the matter under submission and thereafter issued a detailed ruling.

The court granted Robert's request to terminate spousal support and denied Caroline's request to modify spousal support. In doing so, the court interpreted the meaning of "cohabitation" and "cease to be due" as used in the MSA. But because neither term or phrase was defined in the MSA, the court looked to relevant statutes and case law.

For the meaning of "cohabitation," the court examined three cases discussing Family Code section 4323,[2] which provides in relevant part: "(a)(1) Except as otherwise agreed to by the parties in writing, there is a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a nonmarital partner. Upon a determination that circumstances have changed, the court may modify or terminate the spousal support . . . . [¶] (2) Holding oneself out to be the spouse of the person with whom one is cohabiting is not necessary to constitute cohabitation as the term is used in this subdivision." In the court's words, *In re Marriage of Thweatt* (1979) 96 Cal.App.3d 530 (*Thweatt*) "held it was not cohabitation when a woman had what is similar to a boardinghouse arrangement with a man. In [*In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278] and [*In re Marriage of*

_____

[2] All further statutory references are to the Family Code.

5

*Bower* (2002) 96 Cal.App.4th 893], however, the appellate courts emphasized that cohabitation involves a sexual or romantic component and includes significant financial entanglements."

Applying these cases to the facts, the court found it "clear [Caroline] and Williams had a sexual, if not a romantic, relationship for more than three years. They slept together in the same bedroom overnight; indeed, [Caroline] said they slept together unless they were fighting and then Williams slept on the couch. They indicated on social media websites they were in a relationship with the other person. The court does not accept Williams' assertion that the statement on his social media website about their relationship was put there by someone else; it is inconsistent with the other evidence in the record. They went on many vacations together. They celebrated holidays and birthdays together. When Williams left the house one day [Caroline] walked out in a blanket looking like she had just awakened.

"It is clear they lived together. Williams referred to the residence as 'his house.' He helped [Caroline] find a house [the one they cohabited] and he would have been on the lease if his credit had been good. He helped take care of [Caroline's] son when she was away. He admitted at one point that he spent ten to twenty days a month at her house. His later assertion he spent four days a week with his mother in Riverside is not credible and is inconsistent with the testimony of the neighbors. His clothes were at [Caroline's] house, and he was seen by a private investigator coming out of the house on different days in different clothes and driving away. They both assert Williams did not have a key to the house or a garage door opener but that is not dispositive because he was there whenever [Caroline] was there and would have had little need under the circumstances for a key. [Caroline] was upset Williams did not do more chores around the house and that he sat around on the couch watching football.

6

"It is uncertain whether they had any financial entanglements. Williams told others that he paid rent, but there was no documentary or other evidence to support the assertion which Williams later appeared to disavow. [Caroline] stated they did not share bank accounts or credit cards. And she indicated that, at least for the New York trip to the U.S. Open, that they shared the vacation expenses. But this arrangement is very similar to many married couples today: each partner keeps their own money separate and they share the expenses."

Based on these facts, the court found Caroline "has cohabitated as that term is understood in the [MSA]."

As to the phrase "cease to be due," the court quoted section 4334, subdivision (a)'s provision that "[i]f a court orders spousal support for a contingent period of time, the obligation of the supporting party terminates on the happening of the contingency." According to the court, "[t]he inclusion of a cohabitation provision within the [MSA] is a contingency; that is, spousal support payments are due unless [Caroline] cohabits. Even [Caroline] accepts that a finding of cohabitation means at least for the period of cohabitation that spousal support payments are not due."

The court stated that section 4334, subdivision (a), "provides that on the 'happening of the contingency' the spousal support award 'terminates.' Nothing in the [MSA] suggests the general statutory remedy of termination has, or was intended to be superseded by, the use of the phrase 'cease to be due.' The standard dictionary definition of cease is to come to an end, to stop. The standard dictionary definition of terminate is the same. It is a reasonable interpretation of the phrase 'cease to be due' that it means spousal support is to terminate."

"[Caroline] asserts this section was only meant to stop spousal support during the period of cohabitation.  Nothing in the MSA supports that interpretation of what is clear.  Even if such an interpretation were reasonable, the burden of proof would be on [Caroline] to show that was the intent.  Given it is unlikely parole evidence would be admissible, this court is puzzled by what evidence [Caroline] could produce.  The court finds [Caroline's] interpretation inconsistent with the terms of the [MSA] and . . . section 4334."  The court thereafter ordered Caroline to "refund the spousal support payments paid during the period of cohabitation" based on section 4334, subdivision (b), which requires such refund if a supported party fails to notify the supporting party "of the happening of the contingency and continues to accept spousal support payment."

Additional relevant facts will be set forth in the discussion of the issues.

DISCUSSION

*The Meaning of "Cohabitation" as Used by the Parties' in Their MSA*
1. *Standard of Review*

Caroline asserts the standard of review is de novo.  She is partially correct.  ""Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally.""  [Citation.]  We conduct an independent review of the MSA that is the subject of the appeal.  [Citations.]  We construe the MSA under the rules governing the interpretation of contracts generally.  [Citations.]  [¶] As has often been restated:  '"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.  [Citation.]  If contractual language is clear and explicit, it governs.  [Citation.]  On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that

8

the promisee understood it.' [Citations.] [Citation.] "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties."'" (*In re Marriage of Hibbard* (2013) 212 Cal.App.4th 1007, 1012-1013.)

"Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test. Questions of law relate to the selection of a rule; their resolution is reviewed independently. Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.) Thus, we independently determine the meaning of the word "cohabitation" by critically considering the "legal principles and their underlying values," in the context of an MSA providing for termination of spousal support upon cohabitation. (*Ibid.*) We then determine whether substantial evidence supports the meaning we have determined.

2. *Relevant Legal Principles and Their Underlying Values in the Context of the Parties' MSA*

First, we consider "'the object, nature and subject matter of the contract.'" (*In re Marriage of Hibbard*, *supra*, 212 Cal.App.4th at p. 1013.) We note the context in which the word "cohabitation" is used in the MSA. "The spousal support payments

9

required by Section 2.5.2 shall cease to be due on the earliest of the death of [Robert], the death of [Caroline], the cohabitation of [Caroline] or the remarriage of [Caroline]." Significantly, the word "cohabitation" is paired with other events, death and remarriage, in which Caroline's need for support is terminated as a matter of law. "[T]he obligation of a party under an order for the support of the other party terminates upon the death of either party or the remarriage of the other party." (§ 4337.) Death of the supported spouse obviously ends both the supported spouse's need for support, and the correlative obligation of the supporting spouse. And the remarriage of a supported spouse ends the need for support from the former spouse because another person has undertaken that responsibility as a matter of law.

Normally, the cohabitation of a supported spouse merely raises "a rebuttable presumption, affecting the burden of proof, of decreased need for spousal support . . . ." (§ 4323, subd. (a).) But here, the parties agreed in their MSA that cohabitation would have an effect beyond that of merely creating a rebuttable presumption. They decided "cohabitation" would have the *same* effect as death and remarriage. And because both the need for support and the obligation to support is eliminated upon death or remarriage, we conclude the parties also contemplated that "cohabitation," as that word is used in the MSA, would result in a termination of Robert's obligation to provide spousal support for the same reason — namely, the elimination of Caroline's need for support.

"At common law, the term 'cohabitation' means to live together as husband and wife." (*Cochran v. Cochran* (2001) 89 Cal.App.4th 283, 292.) "After 1902, the appellate courts settled on the definition [of cohabitation] as stated that year in *Estate of Mills* (1902) 137 Cal. 298, 301 [70 P. 91]: 'The word "cohabiting," . . . means the living together of a man and woman ostensibly as husband and wife." (*People v. Ballard* (1988) 203 Cal.App.3d 311, 317-318.) "The accepted California concept of cohabitation is the *mutual assumption of those marital rights, duties and obligations which are usually*

10

*manifested by married people*, including but not necessarily dependent upon sexual relations." (*Boyd v. Boyd* (1964) 228 Cal.App.2d 374, 381, italics added.) Marital rights, duties and obligations include the parties' mutual right and obligation to support each other. (See §§ 4300 ["a person shall support the person's spouse"], 4301 ["a person shall support the person's spouse while they are living together out of the separate property of the person when there is no community property or quasi-community property"].) Thus, the word "cohabitation," as used in the context of this MSA, included the requirement that Caroline's cohabitant would have evidenced by words or conduct his commitment to provide for her support, and she likewise would have evidenced by words or conduct her commitment to provide for his support. Any other interpretation would essentially reflect a moral judgment — that living together with a person of the opposite sex in an uncommitted, nonmarital, but romantic and sexual manner, would by itself eliminate the need for support. Such an interpretation would upend California's long established system of no-fault divorce.

As pointed out by Caroline, the most recent California cases discussing the issue of post-dissolution cohabitation have emphasized the potential that a supported spouse's needs may be decreased upon cohabitation. In *In re Marriage of Geraci* (2006) 144 Cal.App.4th 1278, the court explained the significance of cohabitation in the context of addressing whether the presumption of decreased need under section 4323 could be applied to an initial award of support. "'Cohabitation may reduce the need for spousal support because "sharing a household gives rise to economies of scale. [Citation.] Also, more importantly, the cohabitant's income may be available to the obligee spouse." [Citation.]' '[T]he Legislature created the presumption . . . based on thinking that cohabitation . . . creates a change of circumstance so tied in with the payment of spousal support as to be significant enough by itself to require a re-examination of whether such need for support continues in such a way that it still should be charged to the prior spouse.'" (*Geraci*, at p. 1298-1299, fn. omitted.) But the parties here went beyond the

11

presumption of decreased need under section 4323.  By their agreement, they equated "cohabitation" with death and remarriage, thereby equating cohabitation with a living arrangement by which Caroline had no further need for support.  We conclude that the objective manifestation of the parties' intent, their placement of "cohabitation" paralleling death and remarriage, establishes the meaning of "cohabitation" in the context of their MSA:  In this context, "cohabitation" means a "mutual assumption of marital rights, duties and obligations which are usually manifested by married people" (*Boyd v. Boyd*, *supra*, 228 Cal.App.2d at p. 381), including a commitment by both Caroline's cohabitant and Caroline to provide for each other.[3]

To be clear, we do *not* hold that the meaning of "cohabitation" we have attributed to that word, as used in the parties' MSA, has universal application.  A more attenuated relationship may well constitute cohabitation for other purposes, such as creating a rebuttable presumption of decreased need under section 4323.  And nothing in this opinion prohibits the application of section 4323 to modify, or even eliminate, spousal support under that statute.  We hold only that when the word "cohabitation" was used by the parties in their MSA as an event equivalent to death or remarriage, the word implies a relationship with the cohabitant akin to a marriage with the attendant rights and responsibilities of a married couple.

---

[3]     Robert's brief on appeal suggests that Caroline understood at the time of contracting that her living arrangement with Williams met the meaning of cohabitation as used in the MSA.  E.g., Caroline testified, inconsistently, that she believed "it meant that somebody was living with me full time *and that they had another — their own residence*" or that it meant "*that they don't have a residence. . . . [T]hat their residence is my residence . . . .*"  Robert had no understanding, saying only, "I'm going to have to let the court decide."  None of this matters.  "'California recognizes the objective theory of contracts [citation], under which "[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation" [citation].  The parties' undisclosed intent or understanding is irrelevant to contract interpretation.'" (*In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1518.)

12

### 3. *The Court Did Not Address Caroline's Reduced Needs if Any*

The court's ruling, in an extensive 15-page, single spaced minute order, meticulously analyzed the evidence presented by the parties, which included the testimony of Robert and Caroline, the testimony of Williams, expert testimony concerning cell phone records, the testimony of three private investigators, the testimony of seven other percipient witnesses, and concluded that Caroline had "cohabited as that term is understood in the marital settlement agreement." The court based its decision on evidence of the personal relationship between Caroline and Williams and their living arrangements, saying: "It is clear, [Caroline] and Williams had a sexual, if not romantic, relationship for more than three years. They slept together in the same bedroom overnight; indeed, [Caroline] said they slept together unless they were fighting and then Williams slept on the couch. . . . . [¶] It is clear they lived together. Williams referred to the residence as 'his house.' He helped [Caroline] find a house and he would have been on the lease if his credit had been good." These findings are amply supported by substantial evidence.

But the court made no finding regarding Caroline's decreased need for support, if any, resulting from this arrangement, instead ruling that "[i]t is uncertain whether they had any financial entanglements. Williams told others that he paid rent, but there was no documentary or other evidence to support the assertion which Williams later appeared to disavow. [Caroline] states they did not share bank accounts or credit cards. And she indicated that, at least for the New York trip to the U.S. Open, that they shared the vacation expenses. But this arrangement is very similar to many married couples today: each partner keeps their money separate and they share the expenses."

We have concluded that the parties' agreement, reflected in their MSA, to elevate the effect of "cohabitation" from a rebuttable presumption to an event equivalent to death or remarriage, requires an evaluation of Caroline's decreased need, if any, and whether Caroline and Williams were in a committed relationship akin to a marriage.

13

Accordingly, the postjudgment order must be reversed for a retrial on that issue, and, if such a relationship did not exist, whether Robert's spousal support obligation should be modified under section 4323.

*Termination of Jurisdiction over Spousal Support*

Caroline argues the court erred in terminating jurisdiction over the spousal support issue and should have applied section 4336 so as to retain jurisdiction over spousal support in this long term marriage indefinitely. We agree.

The trial court viewed cohabitation as a contingency, the happening of which would terminate spousal support under section 4334. Section 4334, subdivision (a) states: "If a court orders spousal support for a contingent period of time, the obligation of the supporting party terminates on the happening of the contingency." But there has been no finding that the contingency of cohabitation, as we have concluded that term was intended by the parties in their MSA, has occurred. Accordingly, section 4334 has no application.

Section 4336 provides in relevant part: "(a) Except on written agreement of the parties to the contrary or a court order terminating spousal support, the court retains jurisdiction indefinitely in a proceeding for dissolution of marriage or for legal separation of the parties where the marriage is of long duration. [¶] (b) For the purpose of retaining jurisdiction, there is a presumption affecting the burden of producing evidence that a marriage of 10 years or more, from the date of marriage to the date of separation, is a marriage of long duration. . . . [¶] (c) Nothing in this section limits the court's discretion to terminate spousal support in later proceedings on a showing of changed circumstances."

"[S]ection 4336, subdivision (a) is clear and unambiguous in providing two mechanisms for divesting the court of its jurisdiction over spousal support issues in cases of long-term marriages. The parties may agree to such termination, or the court may

14

order it.  In either case, only specific language of termination will divest the court of its fundamental jurisdiction." (*In re Marriage of Ostrander* (1997) 53 Cal.App.4th 63, 65-66.)

Analogizing this case to *In re Marriage of Ostrander*, *supra*, 53 Cal.App.4th 63, Caroline points out the parties' marriage of nearly 18 years was of long duration.  As such, she asserts the court should have applied section 4336, subdivision (a) to retain jurisdiction over spousal support indefinitely because "neither a court order (prior to the trial court's order from which [this] appeal is taken) nor a written agreement purporting to divest the court of continuing jurisdiction over spousal support exists in this case.  We agree.

Although it is possible under the MSA, as we have interpreted it, that cohabitation in a sufficiently committed relationship would divest the court of jurisdiction.  But, as we have explained, the court, not having the benefit of our interpretation of the MSA, did not make a finding in that regard.  Accordingly, the court's order terminating its jurisdiction over spousal support is reversed.

*"Cease to be Due"*

Our analysis of the word "cohabitation," as used in the MSA, also compels the conclusion that the phrase "cease to be due" upon a finding of cohabitation, as we have defined it, means spousal support would terminate.  The parallel use of the words "death," "remarriage," and "cohabitation," as having the same consequence compels that conclusion.  Death and remarriage would terminate spousal support. So must cohabitation as we have defined it.

*Request to Set Aside the Judgment*

Caroline contends, for the first time on appeal, that if the court found she "was cohabiting when she entered the stipulated judgment" and "did not understand material terms of that stipulated judgment," it "could have set that portion of the judgment addressing spousal support aside." Her failure to raise this argument in the trial court forfeits it on appeal. (*In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166, 1174.) Whether Caroline was cohabiting, as that term was used in the MSA under our interpretation, is an issue yet to be decided.

*Attorney Fees*

Caroline's final argument is that the trial court should have awarded her attorney fees and costs under sections 2030 and 2032. She acknowledges there is no order regarding fees and suggests "the trial court must have simply overlooked the issue." But without an order, there is nothing to review. (*Hege v. Worthington, Park & Worthington* (1962) 209 Cal.App.2d 670, 683-684 [where minute order showed motion to dismiss was argued and submitted but "[n]othing further appears in the record concerning it, and it is clear that the trial court did not pass upon it . . . there is nothing before the court on the subject, upon which we can pass"]; *Ikuta v. Ikuta* (1950) 97 Cal.App.2d 793, 795 ["Since no adjudication was made as to these matters [including attorney fees] there is nothing before us for review"].)

16

DISPOSITION

The postjudgment order is reversed and remanded for a new trial. Caroline shall recover her costs on appeal.


IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


THOMPSON, J.