[No. A135901. First Dist., Div. Four. Jan. 15, 2013.]

In re the Marriage of HOWARD L. and LYDIA H. HIBBARD.
HOWARD L. HIBBARD, Appellant, v.
LYDIA H. HIBBARD, Respondent.

COUNSEL

Howard L. Hibbard, in pro. per., for Appellant.

John F. Staley; and Garrett C. Dailey for Respondent.

OPINION

BASKIN, J.*—Howard L. Hibbard (Howard)[1] appeals from an order denying a modification of his obligation to pay his former wife, Lydia H. Hibbard (Lydia), spousal support of $2,000 per month. When the parties, who are both lawyers, divorced, their written agreement required Howard to pay to Lydia spousal support in an amount of $4,000 per month, and it allowed for a downward modification under certain limited circumstances "but shall not be reduced to an amount of less than two thousand dollars per month . . . ." Several years later, Howard became completely disabled and sought to modify the spousal support order by invoking the court's inherent jurisdiction to modify it. (See Fam. Code, § 3591.)[2] The trial court concluded it retained

_____

*Judge of the Contra Costa Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] As is customary in marital dissolution cases, we refer to the parties by their first names for ease of reading and to avoid confusion, not out of disrespect. (*In re Marriage of James & Christine C.* (2008) 158 Cal.App.4th 1261, 1264, fn. 1 [70 Cal.Rptr.3d 715].)

[2] All further statutory references are to the Family Code, unless otherwise stated.

jurisdiction to modify the agreement, but denied relief to Howard based on the absence of any of the very limited circumstances permitting modification of the agreement. We affirm.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Howard is a Vietnam combat veteran with two Bronze Stars for valor in ground combat. As a result of his service in Vietnam, he has suffered from symptoms of posttraumatic stress disorder (PTSD) since 1970. According to his psychotherapist, Howard became totally disabled in 2011 as a result of his PTSD. In 1971, sometime after Howard's honorable discharge, the parties married; they separated in 2001 after nearly 30 years of marriage. They had two children, neither of them minors now.

In 2002, the parties negotiated a marital settlement agreement (MSA) and according to it, both were in "good health" and employed, with Lydia earning $27,000 and Howard earning $84,000 per year. The MSA was attached to and incorporated into the judgment of dissolution, which included the following support agreement: "FAMILY SUPPORT: [Howard] shall pay to [Lydia] by the 5th day of each month the sum of $4,000 per month. Said payments may be reduced to an amount to be mutually agreed upon by [Howard] and [Lydia], after [minor child] reaches the age of eighteen, graduates from high school and the family residence is sold. Such a reduction will be based upon a change of living expenses for [Lydia], *but shall not be reduced to an amount lower than two thousand dollars per month*, and it is agreed by the parties that spousal support is an ongoing obligation of [Howard], and will *only terminate upon [Lydia's] death or remarriage, or the death of [Howard]*. [Howard] waives all right to support, now or in the future." (Italics added.) The MSA also included the following provisions: "VOLUNTARY AND INFORMED CONSENT: The parties further acknowledge and agree that they enter into this agreement voluntarily, free from duress, fraud, undue influence, coercion, or misrepresentation of any kind. [¶] . . . [¶] MODIFICA-TION, REVOCATION OR TERMINATION: This agreement may be altered, amended, modified, revoked, or terminated only by an instrument in writing expressly referring to this document by paragraph to be modified and signed by both parties. Both parties waive the right to claim, contend or assert in the future that this agreement was modified, canceled, superseded or changed by oral agreement[,] course of conduct, or estoppel in the future. [¶] . . . [¶] INVALIDITY; SEVERABILITY: This agreement has been jointly negotiated by and between both parties and shall not be construed against either party. If any term, provision or condition of this agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of

the provisions shall remain in full force and effect and shall in no way be affected, impaired or invalidated."

In May 2002, Lydia's support was reduced to $2,000 per month, when the parties' daughter turned 18 years old. At some point, the family residence was sold.

On February 10, 2012, Howard filed a motion to terminate spousal support, alleging that in December 2011 he had been diagnosed formally with PTSD, relating to his service in Vietnam, and that he was currently unable to work more than two to three hours per day. Howard also alleged in 2012 that he had to borrow $25,000 in order to keep his law practice running and to pay for spousal support; he also had a federal tax lien against him in the amount of $39,000.

In his declaration, Howard indicated he would be applying for "a service connected disability"; he estimated it would take over one year to determine his eligibility. Howard alleged that Lydia's income had increased to $36,000 per year. He alleged that the parties' circumstances had changed and the possibility of either of them becoming disabled was neither contemplated by the parties nor reflected in the MSA. Howard further declared that his legal business had declined "due to the recession and impact on real property," such that his income had been reduced to $38,000 per year—an amount he did not expect to improve. His income and expense declaration stated that his income was $4,000 per month and his expenses were $7,542 per month. Howard later declared that he was shutting down his law practice and that he hoped to receive disability income of $2,940 per month plus Social Security of $1,100 per month for a total of $4,040 per month. He attached his application for Veterans Benefits Administration disability benefits.[3] By reason of the foregoing, he asked that his spousal support be terminated.

---

[3] Howard's declaration in support of his application for disability benefits reads as follows: "Since returning from Vietnam in 1970, I have continuously [*sic*] been hounded by my mind. This has been going on so long, I thought it was normal and learned to cope with it until my anxieties started limiting my work day. [¶] I have suffered war flashbacks and nightmares every day since my discharge. A daily flashback is triggered by random scenes such as a road sign, odd vehicles, people's faces or other scenes, without any direct relationship to war. Almost every night, I am fighting nightmares by running to or from, climbing away or toward, hiding from, searching for something I need or fighting some dangerous circumstances. [¶] In order to keep 'the demons' in check, I abused alcohol and marijuana every night to cope. Unless I drank myself into a stupor, when I would try to go to sleep, my mind would turn into a three ring circus of anxieties and demons. I, like many veterans, threw all the war memories into the closet to forget it and move on. When I came back from the war I worked through attention deficit problems in college and law school. I was able to avoid the debilitating effects of excessive alcohol abuse as I have always maintained a rigorous workout schedule a couple times a week. [¶] Since 2001, I started to write a novel. The book is about an attorney who suffers flashbacks every day and nightmares at night. I used all of my terrifying experiences as chapters in the book. During this process, I began to notice that my ability to think had become

Lydia responded by noting that Howard's law practice grossed $207,760 in 2010, the last year for which he had provided records. From that revenue, he had paid his current wife's salary and $1,200 per year in continuing education expenses. Lydia explained her current financial situation as follows: She was 63 years of age and entitled to a teacher's retirement of $965 per month, which, when added to her Social Security benefits of $773, would be insufficient for her needs without support. She explained how she worked 52 hours per week, 10 months of the year and was just barely surviving with her teacher's salary and spousal support. As a result, she had to meet unexpected expenses with her equity line or credit card. Additionally, she was being treated for a serious, and potentially sight terminating, eye condition. Lydia worried that her future was clouded by the possibility of blindness and asked the court to deny Howard's motion.

The matter was heard on declaration and oral argument on May 17, 2012. The trial court determined that it had jurisdiction and that even though Howard's circumstances were different now, support was subject to an agreed-upon floor of $2,000 per month that was an enforceable and nonmodifiable order. Howard's motion to terminate spousal support was denied.

Howard filed this timely appeal.

## II.

### DISCUSSION

A. *Standard of Review and General Legal Principles Regarding Spousal Support*

" 'Marital settlement agreements incorporated into a dissolution judgment are construed under the statutory rules governing the interpretations of contracts generally.' " (*In re Marriage of Simundza* (2004) 121 Cal.App.4th 1513, 1518 [18 Cal.Rptr.3d 377] (*Simundza*).) We conduct an independent review of the MSA that is the subject of the appeal. (*In re Marriage of Smith* (2007) 148 Cal.App.4th 1115, 1120 [56 Cal.Rptr.3d 341]; *In re Marriage of Davis* (2004) 120 Cal.App.4th 1007, 1017–1018 [16 Cal.Rptr.3d 220]

---

impaired. The previously friendly coping mechanism of alcohol and marijuana started to short circuit my mind so I gave up marijuana and continued with alcohol. In the fall of 2011 alcohol abuse would not calm my mind and I sought help from my VA nurse practitioner when she confronted me about one of my checkup blood tests which came up positive for a high amount of alcohol. [¶] I have had my own law firm since 1973 and thinking through a legal problem is essencial [*sic*] to maintaining my business. I am a sole practitioner with only my wife to help in the office. My ability to think through legal problems started to decrease from 8 or more hours to 5–6 hours in 2001–2005."

(*Davis*).) We construe the MSA under the rules governing the interpretation of contracts generally. (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1221 [92 Cal.Rptr.3d 17]; *Simundza, supra,* at p. 1518; *In re Marriage of Iberti* (1997) 55 Cal.App.4th 1434, 1439 [64 Cal.Rptr.2d 766].)

■ As has often been restated: " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.] If contractual language is clear and explicit, it governs. [Citation.] On the other hand, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." [Citations.]' [Citation.] 'The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]' [Citations.]" (*People v. Shelton* (2006) 37 Cal.4th 759, 767 [37 Cal.Rptr.3d 354, 125 P.3d 290]; accord, *Simundza, supra,* 121 Cal.App.4th at p. 1518; *Davis, supra,* 120 Cal.App.4th at p. 1018; *In re Marriage of Iberti, supra,* 55 Cal.App.4th at pp. 1439–1440.)

■ The focus is on ascertaining and implementing the parties' mutual intent when they entered into the settlement. (*Simundza, supra,* 121 Cal.App.4th at p. 1518.) In performing this task, a court must construe the judgment as a whole rather than separately considering its individual clauses (*Yarus v. Yarus* (1960) 178 Cal.App.2d 190, 201 [3 Cal.Rptr. 50]), and consider the circumstances when the parties signed the settlement agreement (*In re Marriage of Williams* (1972) 29 Cal.App.3d 368, 378 [105 Cal.Rptr. 406]).

Generally, "[s]pousal support awards and agreements, temporary as well as 'permanent,' are modifiable throughout the support period . . . except as otherwise provided by agreement of the parties. [(Fam. Code, §§ 3603, 3651, subd. (c)(1), 4333.)]" (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 17:90, p. 17-32.5 (rev. # 1, 2012), italics omitted.) "Unlike child support jurisdiction, spousal support jurisdiction does not necessarily continue postjudgment and may be divested by the terms of the order. Unless jurisdiction to award spousal support has been either expressly reserved by the order or impliedly reserved . . . , postjudgment spousal support is limited by the stated duration of the order. [Citations.]" (*Id.,* ¶ 17:91, p. 17-32.5 (rev. # 1, 2012), italics omitted.)

 There is an implied statutory retention of jurisdiction in cases where there has been a lengthy marriage. "In marriages of 'long duration' (presumptively 10 years or longer), the court is deemed to retain spousal support jurisdiction 'indefinitely' (notwithstanding the absence of an express reservation of jurisdiction) absent written agreement of the parties to the contrary or a court order terminating spousal support. [Citations.]" (Hogoboom & King, Cal. Practice Guide: Family Law, *supra*, ¶ 17:92, p. 17-32.6 (rev. # 1, 2012), italics omitted.) "Even so, a retention of spousal support jurisdiction after a 'lengthy' marriage does not limit the court's discretion to terminate spousal support in later proceedings on a showing of changed circumstances. [(Fam. Code, § 4336, subd. (c).)]" (*Id.*, ¶ 17:93, p. 17-32.6 (rev. # 1, 2012), italics omitted.) Nevertheless, a court's spousal support jurisdiction is limited by other events set forth in the statutory scheme. For example, as relevant here, a spousal support agreement "may not be modified or revoked to the extent that a written agreement . . . specifically provides that the spousal support is not subject to modification or termination."[4] (§ 3591, subd. (c); see § 3651, subd. (d).)

## B. *Waiver of the Right to Modify*

The question raised in this appeal is whether the parties have agreed in writing that the spousal support is not subject to modification beyond the $2,000 floor or subject to termination except upon the death of either party or Lydia's remarriage. Since there is no conflict in the extrinsic evidence, we make an independent determination of the meaning of the agreement. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].)

 Howard argues that the court has the power to modify his support order. We agree that in general courts can and do modify support orders. Here, however, there is an agreement and a stipulated order, both of which provide that spousal support is not modifiable except for the specific circumstances resulting in a reduction of support to $2,000. The court has limited power under these circumstances. "[T]he trial court's discretion to modify the spousal support order is constrained by the terms of the marital settlement agreement. The court may not simply reevaluate the spousal support award." (*In re Marriage of Aninger* (1990) 220 Cal.App.3d 230, 238 [269 Cal.Rptr. 388].)

---

[4] Section 3591 provides, in relevant part, as follows: "(a) Except as provided in subdivision[] . . . (c), the provisions of an agreement for the support of either party are subject to subsequent modification or termination by court order. [¶] . . . [¶] (c) An agreement for spousal support may not be modified or revoked to the extent that a written agreement, or, if there is no written agreement, an oral agreement entered into in open court between the parties, specifically provides that the spousal support is not subject to modification or termination."

There are several case examples which illustrate the ability of spouses to agree to MSA's that limit the power of the courts to modify spousal support, despite intervening, possibly unfair, changes of circumstance. For example, in *In re Marriage of Rabkin* (1986) 179 Cal.App.3d 1071, 1075 [225 Cal.Rptr. 219], the parties agreed that the wife would receive the first $214,000 from the sale of the family residence, receipt of which would not constitute a change of circumstances for modification of spousal support. When the house sold, she received $45,000 net cash and a note paying $1,793 per month. (*Id.* at p. 1077.) The trial court then reduced her spousal support based in part on the income she was receiving from the note. (*Id.* at p. 1078.) The Court of Appeal reversed, holding that the parties' stipulated support order precluded modification based upon the sale of the residence. (*Id.* at p. 1081.)

Similarly, in *In re Marriage of Sasson* (1982) 129 Cal.App.3d 140, 142 [180 Cal.Rptr. 815], the parties' 1977 MSA provided that the husband would pay the wife "nonmodifiable" spousal support until the death of either party, remarriage of the wife, or March 31, 1985. In 1977, right after the execution of the MSA, the wife began cohabiting with another man, deposited the spousal support payments into a shared bank account with him, held herself out to be this man's spouse, used his name, and bore a child with him. (*Id.* at pp. 142–143.) Despite it being patently unfair to continue spousal support, the husband's motion to terminate support was denied by the trial court and upheld on appeal. (*Id.* at pp. 144, 147.) By agreeing that support would be nonmodifiable on any ground, the husband had waived the ability to modify the order under the provisions of Civil Code former section 4801.5 (now Fam. Code, § 4323). (*Sasson,* at pp. 146–147.)

As these cases instruct, when drafting MSA's, the parties and counsel should be particularly mindful of all possible circumstances that might warrant a modification or cessation of spousal support, and plan accordingly. *Davis, supra,* 120 Cal.App.4th 1007 provides yet another example of the consequences resulting from the lack of careful draftsmanship. There, an agreement provided that spousal support was to continue "until . . . the date [wife] receives the first payment that reflects her [share of husband's] pension, . . . at which time spousal support shall terminate forever" was read literally to require actual receipt of payment. (*Id.* at p. 1011.) The husband chose a retirement option that permitted him to " 'retire' " but continue working for up to five years, during which time his monthly pension payments would accumulate in an account and could be disbursed as a lump sum when he stopped working. (*Id.* at pp. 1011–1012.) The husband sought to pay the wife her share of his monthly pension benefit and invoked the termination provisions of their MSA. (*Id.* at p. 1013.) The trial court agreed with the husband, but the appellate court thought otherwise, ruling that the agreement required the wife to "receive" her interest in the husband's pension—an event that could not occur until the husband stopped working

and the accumulated retirement payments were disbursed. (*Id.* at pp. 1014, 1018–1020; see *In re Marriage of Sherman* (1984) 162 Cal.App.3d 1132, 1138–1140 [208 Cal.Rptr. 832] [precluding spousal support modification upon wife's remarriage where MSA provided terms would not be modifiable].)

In the instant case, the parties agreed that spousal support would "only terminate" upon Howard's death or Lydia's death or remarriage. The MSA further provided that Howard would pay Lydia $4,000 per month in spousal support. When the parties' daughter graduated from high school and the family residence was sold, the $4,000 per month could be reduced to an amount mutually agreed upon by the parties, "based upon a change of living expenses for [Lydia], but shall not be reduced to an amount lower than two thousand dollars per month . . . ." The trial court determined that it had jurisdiction to modify, but nevertheless, based on the terms of the agreement, it lacked the ability to modify the agreed-upon support to less than $2,000. We agree that the MSA made the support order nonmodifiable to not less than $2,000.

Although not cited by the parties, we pause to note that *In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 738–739 [89 Cal.Rptr.3d 849] reached an opposite conclusion, albeit on dissimilar facts. There, an MSA provided that the husband would pay the wife $3,000 per month in spousal support. The wife was entitled to a portion of money the husband inherited from his parents. (*Id.* at pp. 724–725.) If the wife's portion of the husband's inheritance came to her in the form of periodic payments, then the $3,000 per month spousal support could be reduced, " '[b]ut in no event shall said spousal support . . . be in an amount less than one thousand ($1,000.00) dollars per month, regardless of the size of any inheritance monies Wife may receive." (*Id.* at p. 739.) The spousal support payment could also be reduced to $1,000 if the wife's income from active employment exceeded $75,000 per year or if, upon remarriage, her new spouse had an annual income or net worth exceeding specified amounts. (*Ibid.*) The trial court determined the MSA set a floor for support and reduced the spousal support payment to $1,000. (*Ibid.*) The appellate court reversed, finding that the MSA did not make the spousal support order absolutely nonmodifiable to less than $1,000. (*Ibid.*) Rather, the court determined the agreement "specified the $1,000 floor would apply if [wife] received a stream of income from her portion of [husband's] inheritance or when her own salary or that of a new spouse reached a certain level." (*Ibid.*) The court further noted that the wife "implicitly concede[d]" that the agreement did "not set an absolute minimum . . . ." (*Ibid.*)

Here, unlike in *In re Marriage of Alter, supra,* 171 Cal.App.4th 718, the support minimum was not contingent on Lydia's income level or on any

income stream derived from Howard's property. Rather, the MSA unambiguously set a floor of $2,000 per month for spousal support. We conclude the trial court correctly interpreted the MSA as setting a nonmodifiable support minimum of $2,000.

### C. *Howard's Other Contractual Theories*

Despite the otherwise clear language in the MSA providing for a spousal support floor of $2,000 and termination only in the event of either party's death or Lydia's remarriage, Howard asserts various contractual theories to support his position that his support obligations should be terminated. For example, he argues that an "unequivocal provision" in the MSA was required to divest the trial court of its jurisdiction to modify spousal support. According to Howard, the MSA should have contained "specific language precluding judicial modification." Not so. It is well established that no specific formula or " 'magic' words" are required to preclude modification. (*In re Marriage of Jones* (1990) 222 Cal.App.3d 505, 510 [271 Cal.Rptr. 761]; see *In re Marriage of Bennett* (1983) 144 Cal.App.3d 1022, 1025–1026 [193 Cal.Rptr. 113] [holding that despite lack of term " 'irrevocable,' " clear intent of parties was nonmodifiable support obligation].)

Howard's reliance on *In re Marriage of Cesnalis* (2003) 106 Cal.App.4th 1267 [131 Cal.Rptr.2d 436] does nothing to further his position, as that case actually favors Lydia. In *Cesnalis*, the first draft of a stipulated judgment provided that the husband would pay spousal support of $4,000 per month starting in October 2000, and continuing until either party's death, " 'the remarriage of Wife' " or September 2003, whichever occurred first. (*Id.* at p. 1270.) The duration was not modifiable under any circumstances, and the termination date was absolute. (*Id.* at pp. 1270–1271.) The wife insisted the words " 'the remarriage of Wife' " be removed. (*Id.* at p. 1270.) The husband agreed and added other language reiterating the three-year duration of support. (*Id.* at p. 1271.) The stipulated judgment was entered in October 2000. (*Ibid.*) The wife remarried in August 2001 and her former husband moved unsuccessfully to terminate support based on her remarriage. (*Ibid.*) The husband appealed and the Court of Appeal affirmed, explaining as follows: "No particular words are required to waive section 4337 and make spousal support continue upon remarriage, but silence will not do. [Citations.] There must be a written agreement on the issue or the subject. [Citations.] [¶] Section 4337's remarriage termination is not waived simply because the written agreement fails to include remarriage among the terminating events that are expressly mentioned. [Citation.] [¶] Nor is section 4337 overcome if the written agreement simply makes the spousal support provision 'nonmodifiable' in general. [Citations.] This is because 'termination' and 'modification' are distinct concepts describing different ways to alter a support obligation.

[Citations.] [¶] [*In re Marriage of*] *Thornton* [(2002) 95 Cal.App.4th 251 [115 Cal.Rptr.2d 380]] provides that a written agreement to waive section 4337's terminating provisions must be 'specific and express.' [Citation.] Nevertheless, as noted, no particular words are required, and extrinsic evidence is admissible to resolve whether a written agreement has waived the section 4337 remarriage termination provision. [Citations.] Before such extrinsic evidence is properly admitted, however, there must be language in the written agreement reasonably susceptible to interpretation as a declaration of an intent that support continue beyond remarriage. [Citations.]" (*Cesnalis, supra*, at p. 1272.)

To the extent Howard suggests that his disability was not foreseeable and, thus, because of either changed circumstances or impossibility[5] the agreement is subject to modification, this argument is belied by the facts. According to Howard, he had been suffering with PTSD for 30 years when he agreed to the floor on spousal support. He was approximately 52 years old when he signed the agreement and must have known retirement lay ahead for him. Moreover, both Howard and Lydia were licensed attorneys at the time they signed the MSA. Considering the judgment as a whole and the circumstances of the parties when they signed the MSA, we conclude the parties did not intend that a reduction in Howard's income, either through disability or retirement, or some combination thereof, would create changed circumstances warranting modification of the support agreement. (See *Simundza, supra*, 121 Cal.App.4th at p. 1518; *Davis, supra*, 120 Cal.App.4th at p. 1018; *In re Marriage of Iberti, supra*, 55 Cal.App.4th at pp. 1439–1440.)

The language in the parties' MSA and stipulated judgment is specific, and the MSA expressly provides in pertinent part: "[I]n no event shall it be reduced to an amount lower than two thousand dollars per month, and it is agreed by the parties that spousal support is an ongoing obligation of [Howard], and will only terminate upon [Lydia's] death, [Lydia's] remarriage or the death of [Howard]." Indeed, if Lydia became disabled and sought to increase spousal support, she would face the same insurmountable obstacle that Howard faces here—the clear and unambiguous language of the MSA.

---

[5] Howard incorrectly cites the Restatement Second of Contracts, section 265, to argue the theory of frustration of purpose. He claims that since it is now impossible for him to comply with the spousal support provisions, he is excused from his performance. This argument is misplaced for two reasons. First, none of the cases he cited ever applied this theory. Second, Howard omitted the following from the passage he quoted: "Contract liability is strict liability. It is an accepted maxim that *pacta sunt servanda*, contracts are to be kept. The obligor is therefore liable in damages for breach of contract even if he is without fault and even if circumstances have made the contract more burdensome or less desirable than he had anticipated." (Rest.2d Contracts, ch. 11, Introductory Note, p. 309.)

We conclude that as a matter of law the spousal support order in the MSA is not modifiable, or otherwise subject to termination, until one of the stipulated circumstances occurs, namely, the death of either party or the remarriage of Lydia.

## III.

### DISPOSITION

The judgment is affirmed. Lydia is entitled to her costs on appeal.

Reardon, Acting P. J., and Rivera, J., concurred.

A petition for a rehearing was denied February 8, 2013, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 27, 2013, S208783.