Greenwood, P.J.
*851 In March 2013, a private judge retained by the parties in this dissolution action found the premarital agreement they signed in 1996 (PMA) to be enforceable, including the provision waiving spousal support to either party. The trial court denied Appellant Natalia Zarubin's request to set aside the private judge's decision (the set aside order). It then entered a judgment on reserved issues (the judgment) incorporating the PMA, including its waiver of spousal support. On appeal, Natalia[1] asks us to reverse the set aside order and the portion of the judgment denying spousal support.[2] In the unpublished portion of our decision, we conclude the trial court committed no error in upholding the validity of the PMA and issuing the set aside order. In the published portion of the decision, we determine the trial court properly entered judgment incorporating the PMA and its waiver of spousal support. We affirm the judgment.
*852 I. FACTUAL AND PROCEDURAL BACKGROUND
A. Circumstances Leading to Premarital Agreement[3]
Natalia and Respondent Peter Miotke began communicating in 1995; at the time Natalia lived in Russia and Peter in the United States. Both parties were trained architects. All of their correspondence was in English. They first met in person in St. Petersburg, Russia. They met a second time in Houston, Texas, where Natalia was participating in an internship through a cultural exchange program set up by the United States Information Agency in Washington, D.C. To qualify for the program, Natalia had to be proficient in English. In October 1995, Natalia began working for an architectural firm in Houston; she did architectural drafting work in English.
*3 Natalia moved to California in November 1995; she became pregnant with the parties' child in December 1995. During her pregnancy, she worked part-time at Subway sandwiches, doing bookkeeping for the owners. Natalia gave birth to the parties' daughter in September 1996.
After the child's birth, Natalia determined she wanted to remain in the United States. The parties decided to marry. Peter indicated his desire to have a prenuptial agreement; he "secured a paralegal's help." Peter was concerned that Natalia was "scamming" him for money or property. He did not want her to leave the country and "interfere with his property rights." Peter was concerned about having to pay spousal support to Natalia if she lived in Russia.
The parties met with the paralegal and signed the PMA on October 26, 1996. While Peter claimed he obtained a boilerplate agreement from the paralegal on October 17, 1996, and brought it home for Natalia to review, Natalia denied seeing the agreement prior to visiting the paralegal's office. Peter testified the parties had previously discussed a waiver of spousal support and that Natalia would be awarded custody of their children in the event of a dissolution of the marriage. At the time the parties executed the agreement, the "paralegal said that the agreement could be drafted by an attorney and had the parties sign an acknowledgment that the parties knew she was not giving legal advice." The parties agreed "that they went to the paralegal's office to sign the agreement in anticipation of their marriage and that financial disclosures were completed at the paralegal's office."
The PMA consists of four pages, with an additional four pages of financial disclosures attached. Relevant to these appeals, the PMA states, "Both parties *853 agree that in the case of separation or divorce there will be no spousal support owed by either of the parties to the other. Both parties are also in agreement that all children will remain in the custody of Natalia Zarubin upon separation or dissolution unless otherwise stipulated and agreed on by legal separation and/or dissolution of marriage." The parties further agreed if one provision of the PMA was held invalid or unenforceable, the remaining provisions would continue to be valid and enforceable.
The parties married on November 14, 1996, 19 days after the execution of the PMA. On March 26, 1997, Peter filed an I-130 "Immigrant Petition for Relative, Fiance(e), or Orphan," which the United States Department of Justice, Immigration and Naturalization Service approved on July 21, 1997.[4] (Capitalization omitted.)
The parties separated in December 2010, after 14 years of marriage.
B. Court Proceedings Regarding Validity of the PMA
The trial court acquired jurisdiction over the dissolution in April 2011; it entered a status-only judgment dissolving the marriage in November 2011. In response to Natalia's request for spousal support, Peter asked the trial court to determine the validity of the PMA. At a settlement conference in February 2012, the parties stipulated to retain a private judge, the Honorable Catherine Gallagher (Ret.) to hear all issues in the case except for custody and visitation. She set a separate trial on the issue of the validity of the PMA, including *4 a schedule for exchanging witnesses, exhibit lists, and trial briefs.[5]
Judge Gallagher commenced the trial on the validity of the PMA in September 2012; both parties were represented by counsel during the hearing.[6] Judge Gallagher filed her written ruling on May 14, 2013 (Trial Decision), in which she summarized the issues as follows: "[Natalia] attacks the prenuptial agreement on several grounds. [Natalia] claims that she did not *854 execute the agreement voluntarily, that the agreement is unconscionable given [Natalia's] financial and medical circumstances, including her depression, and that the disclosures between the parties were inaccurate as well as being unfair and unreasonable. [Natalia] further argues that the prenuptial agreement is the product of duress, menace, fraud and/or undue influence. Finally, [Natalia] claims that the agreement is unenforceable because as required in Cal. Fam. Code § 1615 (c), [Natalia] was not represented by counsel when the agreement was signed and she was not given seven calendar days between the time that she was first presented with the agreement and the time the agreement was signed."
Judge Gallagher resolved disputed testimony regarding the circumstances surrounding the signing of the PMA. In particular, she found Natalia not credible with respect to the circumstances surrounding the signing of the PMA. "[Natalia] testified that she was still suffering from the birth of their daughter and that their daughter was sick on the day the prenuptial was signed.... [¶] ... [Natalia] suggested that she was prescribed some very strong medications after her daughter's birth for lacerations, giving the impression that the pills were a narcotic and that she could not drive or breast feed her child while taking the medicine.... It is unbelievable that a doctor would prescribe three hundred sixty pills (4 pills a day for 90 days) that were narcotics for pain to a new mother." Although "[Natalia] argues that [the child] was very sickly during the early months of her life and the baby distracted [Natalia] on October 26, 2012 [sic ][7 ].... [Peter] believes that the problem with the formula was fixed with the switch to soy milk and that the urinary tract infections didn't occur until December following her birth." "[Natalia's] testimony was, at times, unreliable and lacked credibility. [Peter's] recollection was much more consistent, reliable and credible."
Judge Gallagher further found, "[Natalia] is obviously an intelligent woman. Although English is not her native language, she was capable of understanding the terms of the prenuptial agreement and the effect of the prenuptial agreement on each party. Before their wedding, [Peter] indicated that he wanted a prenuptial agreement and secured a paralegal's help. Neither party was ever represented by an attorney. Both parties agree that they *5 went to the paralegal's office to sign the agreement in anticipation of their marriage and that financial disclosures were completed. The prenuptial agreement was only four pages long, with an additional four pages of financial disclosures annexed to the agreement and was not particularly complex." Judge *855 Gallagher found no evidence Natalia lacked the mental capacity to enter the PMA. Nor was there evidence Natalia signed the PMA as a result of "trick or deception."
Judge Gallagher determined the parties "discussed, negotiated, and agreed to" the provision of the PMA waiving spousal support and making custody provisions. She found the PMA "expressed [the parties'] desires at the time of execution. The prenuptial agreement likewise disclosed each party's separate property. While these disclosures were not perfect, the level of disclosure of each sides [sic ] assets and liabilities was fair, reasonable, and full." Judge Gallagher observed that Natalia was capable of understanding Peter's disclosures. Although Natalia was not working at the time she signed the PMA, Judge Gallagher noted that Natalia disclosed a net worth of $107,000 in her financial disclosures and admitted to owning a condominium in Siberia and stock from her former Russian employer, Gasprom, as well as a checking account. Peter disclosed net worth of $199,500, and testified his salary had increased about $4,000 annually by the time of the hearing. Judge Gallagher opined "the evidence presented does not reveal a significant disparity in the income of the parties and their respective assets at the time they entered into the agreement," noting Natalia's earning history was similar to Peter's. "Accordingly, based upon the record presented, [Natalia] failed to establish any significant inequality of bargaining power, or any surprise or oppression resulting therefrom."
Based on this evidence Judge Gallagher found Natalia voluntarily executed the PMA, which was "not unconscionable when executed." She ruled the PMA was not the result of fraud, menace, duress, or undue influence. Finally, she found the PMA was not subject to the independent counsel and seven-day waiting period requirements of Family Code sections 1612, subdivision (c), and 1615, subdivision (c), because both were enacted after the parties executed the PMA and neither applies retroactively. Judge Gallagher ruled the PMA was enforceable.[8]
C. Motion to Set Aside
Natalia filed a motion to set aside the Trial Decision, which the assigned trial court judge, the Honorable Margaret Johnson, heard. An attorney filed the motion on Natalia's behalf, and appeared with Natalia at the hearing. In her initial pleadings, Natalia cited Family Code section 2120, subdivision (b),[9] *856 Code of Civil Procedure section 473, subdivision (b),[10] and *6 Family Code section 3691,[11] arguing the court should set aside the PMA because it was "unconscionable and inequitable." She did not provide detailed discussion of the application of these statutes to the facts cited in support of her motion. Natalia also argued the PMA was not enforceable because "the essential elements for a contract did not exist at the time of execution." She alleged there was no disclosure of financial information prior to her signing the PMA, and no compliance with Family Code section 1615, subdivision (c)(2), which required a seven-day waiting period, providing time to seek advice from independent counsel.
On October 7, 2013, Natalia filed a declaration discussing her circumstances at the time she signed the PMA, as well as the history of the parties' relationship between the signing of the PMA and custody proceedings in 2011. She filed another declaration on October 21, 2013, discussing the state of the disclosures the parties provided each other prior to signing the PMA. She did not describe in either declaration why the information she supplied supported her motion to set aside Judge Gallagher's ruling.
The record indicates Judge Johnson held one or more hearings before November 26, 2013, the final hearing on the set aside motion.[12] A declaration from Peter's counsel states Judge Johnson offered Natalia the opportunity to further brief her set aside request, giving her until November 15, 2013, to file additional pleadings. Having not received anything by November 21, 2013, Peter asked Judge Johnson to decline considering anything filed after that date. At the November 26, 2013 hearing, Judge Johnson established that she had asked Natalia's attorney at the time to file, "something pointing out to me exactly what the grounds were for the set-aside." The judge confirmed she had not received anything in response to that request.
However, Natalia had filed a declaration on the day of the hearing, indicating she had been admitted to the hospital in May 2013 for a mental health disability, which the doctors determined had started in July 2012. She *857 argued she was mentally ill when Judge Gallagher held the trial in September 2012, stating, "I was not able to withstand the trial. I was found not credible by the judge. I did not undergo competency evaluation for my diability [sic ] before the 09/2012 trial." She asked the trial court to set aside the Trial Decision under Code of Civil Procedure section 473.
Upon learning of this new declaration, Peter's attorney objected to the trial court considering new allegations not pled in the initial pleadings; Judge Johnson sustained the objection. She allowed Natalia's attorney the opportunity to explain the delay in providing the information prior to the date of the hearing. Judge Johnson then denied the request to set aside the Trial Decision with prejudice, noting Natalia could have notified Peter and the trial court prior to the hearing that she was having difficulty obtaining evidence needed to support her request. On January 14, 2014, Natalia, on her own behalf, filed an *7 additional declaration "in response" to Judge Johnson's denial of the set aside motion. There is nothing in the record on appeal indicating Natalia ever took action to bring her January 2014 declaration to the trial court's attention, or that the trial court ever took action based on the declaration.
On January 21, 2014, Natalia filed notice of her appeal of Judge Johnson's oral order, made November 26, 2013, denying the set aside motion. The trial court filed a written findings and order after hearing confirming that order on January 27, 2014.
D. February 2014 Trial
The trial court set the case for trial on all reserved issues before the Honorable James Towery commencing February 6, 2014, to reach a final judgment. The attorney who represented Natalia at the September 2012 trial and the November 2013 hearing in limited scope appeared briefly but left once it was determined the trial fell outside the scope of her representation; the attorney indicated Natalia signed and filed a substitution of attorney during a break on the first day of trial, although the substitution of attorney form is not part of the record on appeal.
At the outset, Judge Towery indicated his belief that Judge Gallagher's Trial Decision was the "law of the case" as to issues concerning the validity of the PMA. He understood Natalia had filed an appeal of the set aside order. Judge Towery stated spousal support was not an issue that was under consideration for trial, given Judge Gallagher's ruling that the PMA, and the waiver of spousal support contained therein, was valid. Although Natalia had not filed a pretrial statement, based on her belief a bankruptcy stay in place until the day before the trial precluded her from doing so, the court indicated she could still raise her claims for reimbursements, if she brought in all *858 relevant documents by the next day of trial. Natalia requested a continuance not on the grounds that she did not have representation, but rather based on her belief she could not have a fair and impartial trial before Judge Towery, believing he was denying her request for reimbursements, and because of her medical condition. Judge Towery confirmed Natalia could seek reimbursements. He also confirmed he would allow Natalia appropriate breaks to take medication; he denied any continuance of the trial based on her medical condition, finding she did not provide sufficient evidence of her current condition to support such a request.
When Peter attempted to introduce the PMA into evidence in his case in chief, Natalia objected on the grounds she had filed an appeal. Judge Towery overruled the objection, again noting that Judge Gallagher's Trial Decision was part of the "law of the case" guiding property division. "This is not to say that we are reopening the evidence regarding the prenup or seeking to change Judge Gallagher's ruling in any way, but that ruling is final, and this court views that ruling as being binding on it."
On the second day of trial, February 7, 2014, Natalia filed a "trial statement" and "trial brief." In her statement, Natalia listed spousal support as an issue she wanted the trial court to hear. In her trial brief, Natalia argued that the trial court should order spousal support pursuant to Family Code section 1612, subdivision (c), on the basis her waiver of such support in the PMA was unconscionable at the time of enforcement.[13] Judge Towery reviewed *8 Natalia's brief at the start of the second day of trial, and immediately denied the request for spousal support, again reconfirming that Judge Gallagher upheld the PMA, thus resolving the issue of support based on the waiver contained therein. "[This] issue has been litigated. It is resolved and we're not going to relitigate it."
Despite this ruling, near the end of the second day, Natalia reiterated her request for spousal support under Family Code section 1612, subdivision (c), so that she could avoid becoming a "public charge." Judge Towery once again denied her request. "[T]his court has ruled probably a half a dozen times that spousal support is not an issue that we are resolving today. [¶] The spousal support issue was litigated to finality in the prenuptial litigation before Judge Gallagher. Judge Gallagher issued her order. Judge Johnson refused to order a set-aside of Judge Gallagher's order. You filed a notice of *859 appeal. That issue is not before us.... [¶] ... [¶] With respect to 1612(c)-that's of the Family Code-that is a statute that governs matters that can be covered by a prenuptial agreement. Any issues that you have regarding that statute could have been and should have been litigated in the matters before Judge Gallagher regarding the prenuptial agreement. I don't have a transcript of what happened there, but I do know that they're not part of this litigation."
Judge Towery continued the trial for a third day of proceedings on February 11, 2014. Notwithstanding his previous rulings regarding spousal support, the issue came up again, with regard to a pending request for child and spousal support set for hearing on February 20, 2014. Judge Towery reconfirmed that the issue of spousal support was "closed" based on Judge Gallagher's Trial Decision, and Judge Johnson's denial of the set aside motion. Natalia conceded she did not put the issue of section 1612, subdivision (c) before the court.
At the hearing on February 20, 2014, Judge Towery again denied Natalia's request for spousal support. "This Court has specifically found that the order issued by Judge Gallagher pertaining to the parties' premarital agreement controls the issue of spousal support in that both parties waived spousal support in the premarital agreement and that agreement has been upheld as valid. [Natalia], in this and other requests, has failed to state a legal basis on which the order made by Judge Gallagher should be overturned or on which spousal support could be ordered. [Natalia's] citation of Family Code Section 1612 is inapplicable to this request."
On March 4, 2014, the trial court filed a written judgment on reserved issues adopting the rulings made throughout the February 2014 trial. The box on the Judicial Council form Judgment (FL-180) was checked indicating jurisdiction over spousal support was terminated as to both parties. "The Court finds that the premarital agreement executed by the parties prior to marriage included a waiver of such support by both parties and that the Trial Decision of Judge Gallagher filed on May 14, 2013 found the premarital agreement, including the waiver of spousal support, to be conscionable and valid. Based on this finding, this Court, and any other Court, is divested of the jurisdiction to award spousal support to either party."
Natalia filed notice of her intention to move for a new trial on March 7, 2014, *9 which was denied by the trial court on April 29, 2014. On April 30, 2014, Natalia filed notice of her appeal of the judgment. *860 II. DISCUSSION
A.-D.**
E. The Trial Court Did Not Err in Entering the March 2014 Judgment
In her supplemental brief, Natalia argues the trial court committed reversible error in enforcing the PMA, as doing so made her dependent on public assistance. It appears Natalia argues that the law precluded Judge Towery from denying her request for spousal support at trial because circumstances occurring after Judge Gallagher entered the Trial Decision rendered the PMA unconscionable. She does not cite any legal authority supporting this position. Rather, she cites legal authority indicating the trial court must consider whether a PMA is unconscionable at the time of enforcement, asserting she believes the February 2014 trial before Judge Towery resulting in the judgment, rather than the September 2012 trial before Judge Gallagher, was, in effect, the time of enforcement of the PMA. Natalia does not cite any legal authority in support of this contention. Clearly, Judge Towery did not believe it to be the case; he found the Trial Decision was the "law of the case" at the February 2014 trial, and thus denied Natalia's request to revisit spousal support based on the waiver contained in the PMA. We agree the time of enforcement of the PMA was the September 2012 trial.
1. The September 2012 Trial Was the "Time of Enforcement" of the PMA
The question of what constitutes the time of enforcement for purposes of evaluating the unconscionability of the PMA is a question of law, which we review de novo. (See Baxter v. State Teachers' Retirement System (2017) 18 Cal.App.5th 340, 353, 227 Cal.Rptr.3d 37 ["Pure questions of law decided by the trial court are reviewed de novo by the court of appeal."].) Reviewing Judge Towery's application of the law de novo, we find the time of enforcement of the PMA was the September 2012 trial before Judge Gallagher.
As an initial matter, it is not clear the trial court was required to consider whether the PMA was unconscionable at the time of enforcement. Similar to the other 2002 amendments to the Family Code pertaining to premarital agreements, the provision of Family Code section 1612, subdivision (c) requiring the trial court to consider whether the PMA was unconscionable at *861 the time of enforcement does not apply to premarital agreements entered prior to January 1, 2002. (See In re Marriage of Facter (2013) 212 Cal.App.4th 967, 981, 152 Cal.Rptr.3d 79 ( Facter ); In re Marriage of Hill & Dittmer (2011) 202 Cal.App.4th 1046, 1056-1057, 136 Cal.Rptr.3d 700 ; Howell , supra , 195 Cal.App.4th at pp. 1073-1074, 126 Cal.Rptr.3d 539.) We therefore turn to the law in effect at the time the parties signed the PMA.
The Supreme Court has indicated that "circumstances existing at the time of the enforcement of a [pre-2002] spousal support waiver 'might make enforcement unjust.' " ( Facter, supra , 212 Cal.App.4th at p. 983, 152 Cal.Rptr.3d 79, citing In re Marriage of Pendleton and Fireman (2000) 24 Cal.4th 39, 53, 99 Cal.Rptr.2d 278, 5 P.3d 839 ( Pendleton ).) However, Natalia cites no case addressing unjust *10 enforcement of a spousal support waiver that actually rests a finding of unconscionability based solely on circumstances existing at the time of enforcement. In Pendleton , the Supreme Court explicitly stated it was not deciding whether the circumstances at the time of enforcement made the spousal support waiver unjust. ( Pendleton , supra , at p. 53, 99 Cal.Rptr.2d 278, 5 P.3d 839.) In Facter , the Court of Appeal found the waiver was unconscionable at the time of enforcement after first determining it was unconscionable at the time of execution. ( Facter , supra , at p. 983, 152 Cal.Rptr.3d 79.)
Assuming the trial court in the instant matter could have considered unconscionability at the time of enforcement in evaluating the validity of the spousal support waiver contained in the PMA, we are persuaded by the policy permitting bifurcation of trials that the effective enforcement date of the spousal support waiver occurred at the September 2012 trial before Judge Gallagher, not the February 2014 trial on reserved issues conducted by Judge Towery. "The court may separately try one or more issues before trial of the other issues if resolution of the bifurcated issue is likely to simplify the determination of the other issues." (Rule 5.390(b) [formerly rule 5.175(c) ].) Appellate courts discussing the goals of bifurcation contemplate a final resolution of the bifurcated issues to aid in the later resolution of other issues. (See In re Marriage of Macfarlane & Lang (1992) 8 Cal.App.4th 247, 257, 10 Cal.Rptr.2d 157 ; In re Marriage of Wolfe (1985) 173 Cal.App.3d 889, 893-894, 219 Cal.Rptr. 337.) The goal of simplifying the determination of other issues by first determining the validity of a premarital agreement would not be served if the parties could argue that the date of enforcement of the agreement was after the date of the bifurcated trial. Thus for purposes of evaluating unconscionability at the time of enforcement, we find the September 2012 trial to be the relevant point in time.
However, as already discussed, Natalia did not raise the issue of unconscionability at the time of the September 2012 trial to Judge Gallagher;
*862 Natalia conceded this to Judge Towery on the last day of the trial resulting in the judgment. As a result, she cannot raise the issue on appeal. ( Johnson , supra , 47 Cal.4th at p. 603, 100 Cal.Rptr.3d 622, 217 P.3d 1194.)
2. Judge Towery Properly Adopted the Trial Decision in the Judgment
Natalia argues circumstances arising after (or because of) Judge Gallagher's Trial Decision render the waiver of support unconscionable. Absent legal authority confirming Judge Towery could reconsider or modify Judge Gallagher's order, he properly adopted that order at the time of the February 2014 trial. Judge Towery noted Natalia's failure to provide supporting legal authority for her argument in the order filed after the February 20, 2014 hearing. Natalia also does not offer such authority in support of her appeal on this issue, despite her having the burden to do so. (Rule 8.204(a)(1)(B); Mecchi , supra , 245 Cal.App.2d at p. 475, 54 Cal.Rptr. 1.)
In determining whether the trial court can modify or reconsider a mutual waiver of spousal support in a prenuptial agreement because its impact once executed appears unfair to a party, we find it useful to compare the waiver of spousal support in a prenuptial agreement to similar provisions in marital settlement agreements made once a dissolution action is filed that seek to limit modification of support or terminate it entirely. The trial court can modify permanent spousal support orders (those issued pursuant to Family Code section 4320 et seq. ) on a showing of a material change in circumstances, unless *11 the parties agree the order is not subject to modification. ( Fam. Code, § 3651, subd. (a) and (d) ; In re Marriage of Khera & Sameer (2012) 206 Cal.App.4th 1467, 1475-1476, 143 Cal.Rptr.3d 81.) However, where the parties to a dissolution action agree that spousal support may not be modified, courts have held that even a material change in circumstances cannot affect that agreement. In In re Marriage of Hibbard , after the parties agreed support would not be modifiable except under certain enumerated circumstance, the payor spouse suffered a significant reduction in income due to a disability (PTSD), which was not one of the stated reasons to modify support. ( In re Marriage of Hibbard (2013) 212 Cal.App.4th 1007, 1011, 151 Cal.Rptr.3d 553 ( Hibbard ).) In finding the parties' agreement precluded modification, the court noted that such agreements could prevent modification even in "intervening, possibly unfair" circumstances, and warned parties agreeing to nonmodifiable support to "be particularly mindful of all possible circumstances that might warrant a modification or cessation of spousal support, and plan accordingly." ( Id. at p. 1015, 151 Cal.Rptr.3d 553.)
The Hibbard court cited to other examples where intervening circumstances did not circumvent an agreement that spousal support would be *863 non-modifiable, despite the outcome being "possibly unfair." A wife's receipt of monthly payments on a note for the sale of a residence did not justify reducing spousal support where the parties agreed the sale of the residence would not be considered a change in circumstances. ( In re Marriage of Rabkin (1986) 179 Cal.App.3d 1071, 1077-1081, 225 Cal.Rptr. 219.) A party cannot obtain modification of support based on the recipient's non-marital cohabitation with another person when the parties agreed support was not modifiable and would terminate only on the recipient's remarriage. ( In re Marriage of Sasson (1982) 129 Cal.App.3d 140, 146-147, 180 Cal.Rptr. 815.) The concurring opinion in Sasson noted, "as unjust, one-sided and warped as such a state of affairs may appear to be, Husband is unfortunately bound by his own marital settlement agreement since Wife's testimony that she has never remarried is uncontradicted." ( Id. at p. 150, 180 Cal.Rptr. 815.) The Hibbard court described the result as "patently unfair," yet confirmed the Sasson court made the correct decision in light of the parties' agreement. ( Hibbard , supra , 212 Cal.App.4th at p. 1015, 151 Cal.Rptr.3d 553.)
Similarly, once the trial court has terminated its jurisdiction over spousal support, it does not have authority to reinstate that jurisdiction based on a change in the parties' circumstances. A change in the supported spouse's cohabitation status cannot serve to extend the trial court's jurisdiction over spousal support. ( In re Marriage of Minkin (2017) 11 Cal.App.5th 939, 957, 218 Cal.Rptr.3d 407, as modified (May 19, 2017).) Nor can a "current large disparity in the parties' financial positions" allow the trial court to reinstate its jurisdiction over spousal support once it has terminated pursuant to the parties' agreement. ( In re Marriage of Beck (1997) 57 Cal.App.4th 341, 343, 347, 67 Cal.Rptr.2d 79.)
We see no legal basis to distinguish between the enforcement of a premarital agreement to waive spousal support, and a postmarital agreement to do the same. Parties prior to marriage or in dissolution proceedings are entitled to reach agreements about spousal support, and so long as the circumstances surrounding the formation of the agreement are conscionable and lawful, courts will not intervene in the unintended consequences to the parties in the future. From Natalia's perspective, circumstances changed after Judge Gallagher *12 determined the PMA was enforceable. We do not see any legal or factual authority that allowed the trial court to override Judge Gallagher's decision based on that change. We find Judge Towery properly denied Natalia's request for spousal support and affirm the judgment accordingly. *864 F. Conclusion***
III. DISPOSITION
The set aside order and judgment are affirmed. In the interests of justice, each party shall bear his or her costs on appeal. (Rule 8.278(a)(1) and (3).)
WE CONCUR:
Grover, J.
Danner, J.

As is traditional in family law cases, for purposes of readability we refer to the parties by their first names.

Natalia separately appealed the set aside order (case No. H040611) and the judgment (case No. H040972). We ordered the cases be considered together for the purpose of briefing, oral argument and disposition.

In the absence of a certified reporter's transcript, the facts are mainly derived from the private judge's May 14, 2013 trial decision, entered after a bifurcated trial on the issue of the validity of the PMA. We discuss the inadequacy of the record in our analysis.

We took judicial notice of the I-130 sponsor's petition for an immigrant spouse and affidavit of support, filed by Peter with the federal government under the Immigration and Nationality Act.

The record on appeal contains limited information regarding the evidence and pleadings presented to Judge Gallagher. It includes an unfiled document entitled "Petitioner's Trial Brief," listing the September 6, 2012 trial before Judge Gallagher as the relevant hearing. While there is nothing in the record indicating Natalia filed this brief with Judge Gallagher or served it on Peter prior to the September 2012 trial, the legal arguments it outlines mirror those addressed by Judge Gallagher in her written decision.

At oral argument, Natalia's counsel suggested Natalia represented herself at this trial; the record on appeal contradicts this assertion.

The context of this statement indicates Judge Gallagher meant to say October 26, 1996, the day the parties signed the PMA, not October 26, 2012.

It appears that the parties did not return to the private judge for adjudication of other issues as the trial court thereafter conducted all proceedings.

"It occasionally happens that the division of property or the award of support, whether made as a result of agreement or trial, is inequitable when made due to the nondisclosure or other misconduct of one of the parties." (Fam. Code, § 2120, subd. (b).)

"The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." (Code Civ. Proc., § 473, subd. (b).)

"The grounds and time limits for an action or motion to set aside a support order, or any part or parts thereof, are governed by this section and shall be one of the following: [¶] (a) Actual fraud. Where the defrauded party was kept in ignorance or in some other manner, other than his or her own lack of care or attention, was fraudulently prevented from fully participating in the proceeding. An action or motion based on fraud shall be brought within six months after the date on which the complaining party discovered or reasonably should have discovered the fraud." (Fam. Code, § 3691, subd. (a).)

The record does not include minute orders or transcripts from such hearing(s).

Family Code section 1612, subdivision (c) provides, in relevant part, "Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed, or if the provision regarding spousal support is unconscionable at the time of enforcement. " (Italics added.)

See footnote *, ante .

See footnote *, ante .